IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| ALEX GOLDOVSKY, GLYNN FRECHETTE, JOHN KRUPEY, and KRISTIN SCHARF, Individually and on Behalf of All Others Similarly Situated,<br>            *Plaintiffs*, | § § § § § § | |
| v. | § § | CIVIL NO. 6:24-CV-159 |
| MAURICIO J. RAULD, PREMIER LAW GROUP, TIMOTHY B. GERTZ, PV ADVISORS, PLC d/b/a PROVISION and d/b/a PROVISION WEALTH STRATEGIST, CITIZENS & NORTHERN BANK, and WELLS FARGO BANK, N.A.,<br>            *Defendants*. | § § § § § § § § § § | JURY |

**ORIGINAL CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................. 1

II. PARTIES AND RELEVANT NON-PARTIES ................................................... 3

  A. Plaintiffs ............................................................................................................ 3
  B. Defendants ......................................................................................................... 4
  C. Relevant Non-Parties ........................................................................................ 5

III. JURISDICTION AND VENUE ........................................................................ 6

IV. FACTS ................................................................................................................ 8

  A. The Carbon Capture Technology Promoted by the *SEC v. Hill* Defendants. ................... 8
  B. The Ponzi Scheme ............................................................................................. 9
    1. The Pattern of Cash Flows in CETA's Wells Fargo Accounts for CCUs Sold
        Directly to Investors. ........................................................................... 10
    2. The Pattern of the Creation of the FIC Partnerships. ........................................ 11
    3. The Pattern of Cash Flows in the FIC Partnership Bank Accounts and
        the Roy Hill Trust Bank Accounts……………………………………13
    4. The Judgments in *SEC v. Hill* Confirm the Existence of the Ponzi Scheme……..………15
  C. The Advisory Team Defendants' Involvement in the Ponzi Scheme. ............................. 16
    1. The Ponzi Scheme Misrepresentations. ........................................................... 16
      a. The Untrue Statements in the Business Plans. ............................................... 17
      b. The Omissions in the Business Plans………………………………………...22
    2. Rauld and Premier Substantially Assisted the Ponzi Scheme. ........................... 23
    3. Gertz and ProVision Substantially Assisted the Ponzi Scheme. ....................... 25
  D. The Bank Defendants' Involvement in the Ponzi Scheme. ............................... 33
    1. The Bank Defendants Were Aware of the Ponzi Scheme. ................................ 31
      a. The Bank Defendants Are Required by Law to Know their Customers
        and the Customers' Banking Behavior. .................................................. 31
      b. Wells Fargo Maintains Sophisticated Internal Controls
        and Programs to Detect Fraud. ................................................................ 36
      c. Wells Fargo Enhanced its Internal Control Mechanisms
        Before the Ponzi Scheme Began. ............................................................ 38
      d. Wells Fargo Has its Own Artificial Intelligence Platform
        to Monitor Customer and Account Activity………………………… .…41
      e. C&N Bank Was Aware of the Timing of the Creation of the
        FIC Partnerships……..………………………………………………42
    2. The Bank Defendants Substantially Assisted the Ponzi Scheme. ...................... 42

E. The Unregistered Securities. ..................................................................... 43

   1. The Offers and Sales of the Unregistered Securities. ....................................... 44

   2. The Promotion of the Unregistered Securities. .............................................. 44

   3. The Advisory Team Defendants Were Aware of and Assisted
      Sales of Unregistered Securities. ............................................................. 46

   4. The Advisory Team Defendants Acted with Intent or Reckless Disregard. ................... 46

F. Offers and Sales of Securities by Means of Misrepresentations. ...................................... 46

   1. Untruths and Omissions Were Used to Offer and Sell the Securities. ........................... 47

      a. The Ponzi Scheme Misrepresentations Were Also Used to Sell the Securities. ......... 47

      b. Untrue Statements that the Carbon Capture Technology Was Patented. .................. 47

      c. Untrue Statements that the CCUs Were Economical and Cost-Effective. ................. 48

      d. Untrue Statements About Demand for the Carbon Capture Technology. ................. 48

      e. Untrue Statements that Exxon Was a CETA Customer. ............................................. 49

   2. The Untruths and Omissions Were Made with Actual Awareness they Were False. ......50

   3. The Misrepresentations Were Made to Induce Investors to Purchase the Interests. ....... 51

   4. Plaintiffs Relied on the Misrepresentations. ................................................. 51

   5. The Advisory Team Defendants Substantially Assisted the Misrepresentations
      of the *SEC v. Hill* Defendants. ................................................................ 52

G. The Advisory Team Defendants' Participation in FIC's Breach of Fiduciary Duty. ........ 52

V. VICARIOUS LIABILITY ALLEGATIONS ........................................................ 53

VI. CLASS ACTION ALLEGATIONS ............................................................... 54

VII. CAUSES OF ACTION ....................................................................... 56

  COUNT I: VIOLATIONS OF THE TEXAS SECURITIES ACT ....................................... 56

  COUNT II: STATUTORY FRAUD ............................................................... 58

  COUNT III: COMMON LAW FRAUD ............................................................ 60

  COUNT IV: NEGLIGENT MISREPRESENTATION ................................................ 61

  COUNT V: KNOWING PARTICIPATION IN BREACH OF FIDUCIARY DUTY .......... 62

VIII. PRAYER FOR RELIEF ..................................................................... 63

IX. DEMAND FOR JURY TRIAL ................................................................. 64

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| ALEX GOLDOVSKY, GLYNN FRECHETTE, JOHN KRUPEY, and KRISTIN SCHARF, Individually and on Behalf of All Others Similarly Situated, *Plaintiffs*, | § § § § § § | |
| v. | § § | CIVIL NO. 6:24-CV-159 |
| MAURICIO J. RAULD, PREMIER LAW GROUP, TIMOTHY B. GERTZ, PV ADVISORS, PLC d/b/a PROVISION and d/b/a PROVISION WEALTH STRATEGIST, CITIZENS & NORTHERN BANK, and WELLS FARGO BANK, N.A., *Defendants*. | § § § § § § § § § § | JURY |

## ORIGINAL CLASS ACTION COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Alex Goldovsky, Glynn Frechette, John Krupey, and Kristin Scharf, Plaintiffs, file this Original Class Action Complaint against Mauricio J. Rauld, Premier Law Group, Timothy B. Gertz, PV Advisors, PLC d/b/a ProVision and d/b/a ProVision Wealth Strategist, Citizens & Northern Bank, and Wells Fargo Bank, N.A., Defendants, and state and allege as follows:

## I. INTRODUCTION

1.      This is a class action under Texas law to recover damages suffered by the Plaintiffs and all persons similarly situated who invested in a fraudulent Ponzi scheme, "a phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors." *See Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 662, n. 3 (Tex. 2016).

2.      Plaintiffs invested in investment contracts and limited partnerships that were actually part of a Ponzi scheme. Plaintiffs discovered the fraudulent Ponzi scheme after the United

States Securities and Exchange Commission ("SEC") filed suit in this Court on May 3, 2023 to stop two individual defendants and the two companies that they controlled from soliciting investors in their Ponzi scheme. The SEC's lawsuit is styled *SEC v. Roy W. Hill, et al.*, and is pending as Civil Action No. 6:23-cv-00321-ADA in the United States District Court for the Western District of Texas, Waco Division. It will be referred to in this Complaint as "*SEC v. Hill.*"

3.      The *SEC v. Hill* Defendants defrauded the investors in the Ponzi scheme by selling unregistered securities from, by and through Texas, in transactions that emanated from Texas. They sold these unregistered securities by making untrue statements to the investors about the unregistered securities, and by omissions that made their statements misleading. The *SEC v. Hill* Defendants thereby committed primary violations of the Texas Securities Act (Title 12 of the Texas Government Code) and the Texas Business and Commerce Code, § 27.01 ("Fraud in Real Estate and Stock Transactions," known in Texas as "statutory fraud"). The *SEC v. Hill* Defendants also committed torts under Texas common law of including fraud and breach of fiduciary duties.

4.      Plaintiffs do not bring this action against any of the *SEC v. Hill* Defendants and do not assert any claims under federal law. Plaintiffs bring this action against other parties who made the Ponzi scheme possible, and Plaintiffs rely on Texas law to bring these other parties to justice.

5.      Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all others. Plaintiffs' information and belief are based on the independent investigation of their undersigned counsel, conducted under Plaintiffs' supervision and at Plaintiffs' expense. This investigation includes, but is not limited to, (a) review and analysis of public records, or the lack of public records, at such agencies as the SEC, the Texas Secretary of State, and the Texas Securities Commission; (b) documents prepared and distributed by defendants and relevant non-parties including contracts, business plans,

2

schedules, budgets and "pro formas"; (c) recorded, transcribed or summarized conferences, webinars and podcasts involving defendants and relevant non-parties; (d) emails and other communications of defendants and relevant non-parties; (e) consultation with industry and financial experts; (f) pleadings, filings, evidence and court orders in the *SEC v. Hill* action, the fact that the SEC's action is based on a thorough investigation by the SEC and FBI,  and the fact that the Court entered judgments against Roy W. Hill and Eric N. Shelly on the facts pleaded by the SEC in that action; and  (g)  pleadings, filings, evidence and court orders in other litigation involving defendants or involving the *SEC v. Hill* Ponzi scheme.  Plaintiffs' independent investigation has been conducted over a period in excess of eight months and has been reasonable under the circumstances.

6.     The following factual allegations have evidentiary support based on Plaintiffs' independent investigation described in the preceding paragraph, or will likely have evidentiary support after a reasonable opportunity for further investigation and discovery of information that is within the control of defendants, relevant non-parties and others.

## II. PARTIES AND RELEVANT NON-PARTIES

### A. Plaintiffs

7.     Plaintiff Alex Goldovsky ("Goldovsky") is an individual who resides in and is a citizen of Pennsylvania. Goldovsky invested $1,300,000.00, as follows:

$500,000.00 in SYN 09, LP on or about April 28, 2022;
$300,000.00 in CC5 Shares 2022, LP on or about August 31, 2022, and
$500,000.00 in CC6 Shares 2022, LP on or about February 21, 2023.

8.     Plaintiff Glynn Frechette ("Frechette") is an individual who resides in and is a citizen of Colorado. Frechette invested $200,000.00, as follows:

$100,000.00 in OShares 04, LP on or about September 2, 2022, and
$100,000.00 in OShares 05, LP on or about April 20, 2023.

9.     Plaintiff John Krupey ("Krupey") is an individual who resides in and is a citizen of Puerto Rico. Krupey invested $100,000.00 in OShares 04, LP on or about October 11, 2022.

10.     Plaintiff Kristin Scharf ("Scharf ") is an individual who resides in and is a citizen of Colorado. Scharf invested $200,000.00, as follows:

$100,000.00 in OShares 04, LP on or about September 23, 2022, and
$100,000.00 in OShares 05, LP on or about March 27, 2023.

11.     In this Complaint, Goldovsky, Frechette, Krupey and Scharf will be referred to collectively as "Plaintiffs."

**B. Defendants**

12.     Defendant Mauricio J. Rauld ("Rauld") is an individual who resides in and is a citizen of California. Raud is licensed as a lawyer by the State of California and maintains an office and does business in San Clemente, California. Rauld is a member of the Freedom Impact Consulting "Advisory Team."

13.     Defendant Premier Law Group (Premier") is a law firm with an office in San Clemente, California. Premier is a citizen of California. Rauld is the Chairman of Premier.

14.     Defendant Timothy B. Gertz ("Gertz") is an individual who resides in and is a citizen of Arizona. Gertz is a member of the Freedom Impact Consulting "Advisory Team."

15.     Defendant PV Advisors, PLC is a professional limited liability company organized and existing under the laws of the State of Arizona. Its principal place of business is in Phoenix, Arizona, and it is a citizen of Arizona It does business under the assumed names "ProVision" and "ProVision Wealth Strategist" and will be referred to as "ProVision."

16.     In this Complaint, Plaintiffs will refer to Rauld, Premier, Gertz and ProVision as the "Advisory Team Defendants."

17.    Defendant Citizens & Northern Bank ("C&N Bank") is a financial institution organized and existing under the laws of the State of Pennsylvania, has its principal place of business in Wellsboro, Pennsylvania, and is a citizen of Pennsylvania.

18.    Defendant Wells Fargo Bank, N.A. ("Wells Fargo") is a national banking association organized and existing under the laws of the United States under 12 U.S.C. § 21. Wells Fargo has its principal place of business in San Francisco, California and is a citizen of California..

19.    In this Complaint, Plaintiffs will refer to C&N Bank and Wells Fargo collectively as the "Bank Defendants."

**C. Relevant Non-Parties**

20.    Roy W. Hill ("Hill") is a resident of Fairfield, Texas. Hill has agreed to the entry of a judgment in *SEC v. Hill* and has admitted the SEC's allegations. ECF Nos. 37, 40.

21.    Clean Energy Technology Association, Inc. ("CETA") is a Texas corporation located in Fairfield, Texas. Hill founded and controlled CETA as its president and chairman.

22.    Eric N. Shelly ("Shelly") resides in Ocala, Florida and West Chester, Pennsylvania. Shelly founded, owns, and controls FIC as its CEO.  Shelly has agreed to the entry of a judgment in *SEC v. Hill*  and has admitted the SEC's allegations. ECF Nos. 38, 41.

23.    Freedom Impact Consulting, LLC ("FIC") is a Pennsylvania corporation formed by Shelly with its principal place of business in West Chester, Pennsylvania.

24.    In this Complaint, Plaintiffs will refer to Hill, CETA, Shelly and FIC collectively as the "*SEC v. Hill* Defendants."

25.    FIC sponsored at least 60 limited partnerships that were used to attract investor funds for the Ponzi scheme. FIC created 59 of these partnerships by filing a Certificate of Formation for each with the Texas Secretary of State. These 59 partnerships are listed on Exhibit

1 to this Complaint, which is incorporated herein by reference. The principal office of each of these 59 Texas partnerships is at 5900 Balcones Drive, Suite 100, in Austin, Texas. Each Certificate of Formation for these Texas partnerships named FIC as the general partner.

26.     FIC formed one partnership, "SLF Pipeline, Limited Partnership," by filing a Certificate of Formation with the Wyoming Secretary of State. SLF Pipeline's principal office is in Jackson, Wyoming.  Its Certificate of Formation named FIC as the general partner. SLF Pipeline registered as a foreign limited partnership with the Texas Secretary of State on September 23, 2020. On this registration, it named FIC as its governing person and gave 5900 Balcones Drive, Suite 100, in Austin, Texas as its registered agent's address and its registered office address.

27.     In this Complaint, Plaintiffs will collectively refer to the 59 Texas partnerships listed on Exhibit 1 and the Wyoming entity, SLF Pipeline, as the "FIC Partnerships."

### III. JURISDICTION AND VENUE

28.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 (codified at 28 U.S.C. § 1332(d)(2)).

29.     At least one member of the proposed class is a citizen of a different state from any defendant. In particular, all Plaintiffs are citizens of states different from Defendants Rauld, Premier, Gertz, ProVision and Wells Fargo. *See* Paragraphs 7-10, 12-15 and 18, above.

30.     There are more than one hundred members of the proposed class. In particular, there are over 600 members of the proposed class.

31.     The aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs. In particular, the proposed class has suffered net losses in excess of $170,000,000.00.

32.     This Court has specific jurisdiction over the Defendants because Plaintiffs' claims arise out of and relate to Defendants' unlawful conduct in Texas. The primary violations of Texas

law by Hill and CETA occurred in Fairfield, Texas. The interests sold to investors were unregistered securities sold from, by and through Texas, in transactions that emanated from Texas. Rauld and FIC created 59 of the FIC partnerships by filing Certificates of Registration in Austin, Texas, and Rauld and FIC also filed an Application for Registration of a Foreign Limited Partnership for SLF Pipeline in Austin, Texas. As Plaintiffs show in this paragraph, and as Plaintiffs allege in more detail below in all of the remaining paragraphs of this Complaint, which are incorporated by reference in this paragraph, (a) each of the Defendants has purposely directed its activities toward Texas and purposely availed itself of the privileges of conducting activities in Texas, (b) Plaintiffs' causes of action that arise out of and result from the Defendants' forum-related contacts, and (c) the exercise of personal jurisdiction over the Defendants is fair and reasonable.

33.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because, as Plaintiffs show in the preceding Paragraph 32, and as Plaintiffs allege in more detail below in all of the remaining paragraphs of this Complaint, which are incorporated by reference in this paragraph, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

34.     In the alternative, Defendants Premier, ProVision, C&N Bank and Wells Fargo are entities with the capacity to sue and be sued, are subject to personal jurisdiction in judicial districts in Texas with respect to Plaintiffs' civil action herein, are deemed to reside in such districts under 28 U.S.C. § 1391(c)(1) and are therefore residents of Texas under 28 U.S.C. § 1391(b)(1).

35.     In the further alternative, venue lies in this District under the doctrine of pendant venue, because all of Plaintiffs' claims arise out of a common nucleus of operative facts.

## IV. FACTS

36.    The Ponzi scheme was based on a supposedly new technology developed by CETA that combined removal and underground storage of carbon dioxide with enhanced oil and gas production. The technology was a fraud: it produced no revenues, and the returns paid to investors were actually funded with investors' money.

**A. The Carbon Capture Technology Promoted by the *SEC v. Hill* Defendants.**

37.    Hill and CETA claimed that CETA's mobile carbon capture units ("CCUs") used a proprietary solvent to remove carbon dioxide ("$CO_2$") from natural gas. They offered types of CCUs, the "$CO_2$ *TRANSMISSION* Pipeline" and the "$CO_2$ *NOMAD*."

 

$CO_2$ *TRANSMISSION* Pipeline                    $CO_2$ *NOMAD*

CETA originally priced the "$CO_2$ *TRANSMISSION* Pipeline" units at \$1,500,000.00, later raising the price to \$1,650,000.00. CETA originally charged \$1,040,000.00 for the smaller "$CO_2$ *NOMAD*" units, later raising the price to \$1,060,000.00.

38.    Hill and CETA claimed that their CCUs allowed gas producers to (a) process gas at the well to be ready for market without going to a separate processing site; (b) inject the $CO_2$-infused solvent back into the well to enhance recovery of oil and gas, and (c) Sequester the $CO_2$ underground to reduce climate change.

39.    CETA sold CCUs to investors as part of a set of agreements in which, Hill and CETA claimed that gas producers would lease the CCUs in exchange for a share of the revenues from their enhanced production. Some investors bought CCUs directly from CETA. The high cost of a single CCU made investing unattractive or not possible for many investors. Hill and CETA teamed with Shelly and FIC to sell interests in limited partnerships for fractions of the cost of individual CCUs, allowing investors to invest smaller amounts and pool their funds. The partnerships created by Shelly, FIC and Rauld would supposedly purchase and operate CETA CCUs. This partnership model vastly expanded the number of potential investors.

**B. The Ponzi Scheme.**

40.    The *SEC v. Hill* Defendants ran a Ponzi scheme. The scheme was evident from (1) the pattern of the cash flows into and out of the CETA bank accounts at Wells Fargo for CCUs sold directly to investors, (2) the pattern of the creation of the FIC Partnerships that were used to defraud Plaintiffs and all similarly situated investors, and (3) the pattern of the cash flows into and out of the FIC Partnership bank accounts. The judgments against Hill and Shelly in *SEC v. Hill* based on the SEC's complaint additionally confirm the existence of the Ponzi scheme.

41.    In fact, the CCUs did not produce business revenues. On Plaintiffs' information and belief, and based on evidentiary support that Plaintiffs reasonably believe they will develop after a reasonable opportunity for further investigation and discovery, Plaintiffs allege that the only

CCUs sold by CETA were non-working prototypes, and some investors were sold CCUs that did not even exist. CETA did not lease CCUs to oil and gas producers and had no revenues from them.

**1. The Pattern of Cash Flows in CETA's Wells Fargo Accounts for CCUs Sold Directly to Investors.**

42.    As alleged in Paragraph 39, above, some investors bought CCUs directly from CETA. A representative sample of five investors who bought CCUs directly from CETA between November 2021 and June 2022 illustrates the pattern of the cash flows into and out of the same CETA bank account, No. 37-65/1119, at Wells Fargo. [1]

43.    All five investors purchased the larger $CO_2$ *TRANSMISSION* Pipeline units at the later $1,650,000.00 price (*see* Paragraph 37, above). Their Bills of Sale show the following:

| Investor | Sale Date | Number of Units | Total Paid |
|----------|-----------|-----------------|------------|
| Investor A | 11-19-2021 | 1 | $1,650,000 |
| Investor B | 12-7-2021 | 1 | $1,650,000 |
| Investor C | 3-15-2022 | 1 | $1,650,000 |
| Investor D | 5-23-2022 | 1 | $1,650,000 |
| Investor E | 6-1-2022 | 1 | $1,650,000 |

44.    The next table shows the quarterly payments received by these investors. Each received quarterly payments from CETA by checks on Wells Fargo Account No. 37-65/1119. The "Memo" field on the checks identifies the quarter or the months for which the check was written.

| Investor | Q4 2021 | Q1 2022 | Q2 2022 | Q3 2022 | Q4 2022 |
|----------|---------|---------|---------|---------|---------|
| Investor A | $73,801 | $218,940 | $244,272 | $256,094 | $228,361 |
| Investor B | $73,567 | $214,776 | $251,453 | $252,720 | $228,530 |
| Investor C | | | $223,002 | $245,388 | $231,531 |
| Investor D | | | | $245,176 | $228,234 |
| Investor E | | | | $249,206 | $232,775 |

---

[1] While investors have been named in the public record in *SEC v. Hill* (*see* ECF 52-6), Plaintiffs are not naming investors in this Complaint without the permission of the individuals involved. The six investors will be described as "Investor A" through "Investor E." Two of these five investors were investment entities and three were individuals. According to a witness familiar with the financing of the CCU purchases by these investors, all had a common friend or relative who invested in the CCUs after making investments in other CETA operations.

This is a repetitive pattern of similar quarterly payments to investors.

45.    Based on the foregoing Paragraphs 41-44, the following facts were evident to anyone aware of the timing and amounts of cash flows into and out of the CETA bank accounts at Wells Fargo for CCUs sold directly to investors:

    a)    Large amounts of cash, in repetitive amounts over $1 million, were deposited by CETA in its accounts at Wells Fargo from payments made by investors.

    b)    No amounts consistent with business operation revenues were deposited in the CETA accounts at Wells Fargo.

    c)    Quarterly payments went out of the CETA accounts at Wells Fargo to the same investors who were the sources of CETA's original large deposits.

    d)    The quarterly payments were in amounts that were either almost identical or in a narrow range for investors whose original payments were made around the same times.

**2. The Pattern of the Creation of the FIC Partnerships.**

46.    The pattern of the *SEC v. Hill* Defendants' creation of new investment partnerships shows a pre-conceived plan to raise new investor funds in amounts sufficient to pay promised returns to earlier investors.

47.    Plaintiffs' investigation shows that FIC, Rauld and Premier created new limited partnerships around the end of each quarter. This would raise funds to pay promised quarterly returns to prior investors.

48.    FIC, Rauld and Premier created Freedom Energy Fund, LP, a Texas limited partnership, on December 10, 2019. They created Freedom Energy Fund 2, LP, another Texas limited partnership, on February 11, 2020, prior to the end of the first quarter of 2020. FIC then created SLF Pipeline, LP, a Wyoming entity, on August 24, 2020, a month before the end of the third quarter of 2020.

49.     FIC, Rauld and Premier then began to register Texas limited partnerships in batches. They registered three partnerships on October 27, 2020, and another partnership on November 30, 2020. With the end of the fourth quarter of 2020 approaching, FIC, Rauld and Premier registered four partnerships on December 28, 2020. (Exhibit 1 summarizes the creation dates of the FIC Partnerships organized under Texas law.)

50.     For the next two years, FIC, Rauld and Premier created new partnerships primarily before the end of the next quarter. The following timeline shows the end of each quarter in blue, and the dates new partnerships were created in red:

| Date | Quarter | Partnerships Created |
|------|---------|---------------------|
| Mar. 22, 2021 | | 4 Partnerships |
| Mar. 31, 2021 | 1st Quarter | |
| June 1, 2021 | | 1 Partnership |
| June 30, 2021 | 2nd Quarter | |
| July 6, 2021 | | 3 Partnerships |
| Aug. 11, 2021 | | 4 Partnerships |
| Sept. 14, 2021 | | 6 Partnerships |
| Sept. 30, 2021 | 3rd Quarter | |
| Dec. 29, 2021 | | 7 Partnerships |
| Dec. 31, 2021 | 4th Quarter | |
| Mar. 14, 2022 | | 6 Partnerships |
| Mar. 31, 2022 | 1st Quarter | |
| May 23, 2022 | | 9 Partnerships |
| June 30, 2022 | 2nd Quarter | |
| Aug. 8, 2022 | | 5 Partnerships |
| Sept. 30, 2022 | 3rd Quarter | |
| Dec. 31, 2022 | 4th Quarter | |
| Jan. 13, 2023 | | 2 Partnerships |
| Feb. 7, 2023 | | 2 Partnerships |
| Mar. 31, 2023 | 1st Quarter | |

The timing of the creation of the FIC Partnerships shows that new partnerships were created around the end of each quarter to raise new funds to pay the promised quarterly returns to investors in the earlier partnerships.

12

**3. The Pattern of Cash Flows in the FIC Partnership Bank Accounts and the Roy Hill Trust Bank Accounts.**

51.      Most of the FIC Partnerships required a minimum investment in round numbers of $50,000, $100,000 or $200,000. Most of the FIC Partnerships promised a 10% quarterly return.

52.      Plaintiff Goldovsky invested $500,000.00 in SYN 09, LP. He sent a wire transfer for that amount to an account FIC established for SYN 09, LP at C&N Bank. He received two quarterly payments before the SEC shut down the Ponzi scheme, a $50,000 payment on November 24, 2022 for the "Q3 2022 Distribution" and a $50,000 payment on March 3, 2023 for the "Q4 2022 Distribution." Both of these distributions came from the same account FIC established for SYN 09, LP at C&N Bank. Plaintiff Goldovsky thus received distributions for exactly 10% of his original investment. His original investment and the two distributions were in large round dollar amounts.

53.      The pattern of Plaintiff Goldovsky's investment and distributions in the C&N Bank account for SYN 09, LP is just one example of the patterns for hundreds of the investors in FIC partnerships, who (a) also received quarterly distributions equal to 10% of their original investments; (b) whose original investments went into C&N Bank accounts established by FIC for each FIC Partnership, and (c) whose distributions came from the same C&N Bank account for their FIC Partnership.

54.      Not all FIC Partnerships paid exact 10% quarterly returns. Plaintiffs Frechette, Krupey and Scharf each invested $100,000.00 in OShares 04, LP. Each sent a wire transfer for that amount to an account FIC established for OShares 04, LP at C&N Bank. Each received a "Preferred Return" of $5,910.84 on March 4, 2023. Each of these distributions came from the same account FIC established for OShares 04, LP at C&N Bank.

55.    The repetitive pattern of Plaintiffs Frechette's, Krupey's and Scharf's investments and distributions in the C&N Bank account for OShares 04, LP is just one example of repetitive patterns for hundreds of the investors in FIC partnerships. For example, over 30 investors made $100,000.00 investments and received exactly $66,872.28 before the SEC shut down the Ponzi scheme. Eleven investors bought 10 units of an FIC partnership for $100,000.00 per unit and received exactly $65,708.33 per unit before the SEC shut down the Ponzi scheme.  These are just a few examples of disparate investors receiving identical sums on the same days from the same FIC Partnership accounts at C&N Bank.

56.    On Plaintiffs' information and belief, and based on evidentiary support that Plaintiffs reasonably believe they will develop after a reasonable opportunity for further investigation and discovery, Plaintiffs allege that all or most of the amounts investors sent to the FIC Partnership accounts at C&N Bank were immediately transferred to "Roy Hill Trust" accounts at Wells Fargo.

57.    Based on the foregoing Paragraphs 41 and 51-56, the following facts were evident to anyone aware of the creation dates of the FIC Partnerships and the cash flows into and out of the FIC Partnership bank accounts and the "Roy Hill Trust" accounts at Wells Fargo:

a)  Large amounts of cash, usually in increments of $100,000.00, came into the FIC Partnership accounts at C&N Bank shortly after they were created by FIC and Rauld.

b)  All or most of these sums were immediately transferred to "Roy Hill Trust" accounts at Wells Fargo.

c)  No amounts consistent with business operation revenues were deposited in either the to "Roy Hill Trust Accounts" accounts at Wells Fargo or the FIC Partnership accounts at C&N Bank.

d)  New partnerships were created by FIC and Rauld before the end of quarters when investors were promised quarterly returns.

14

e) Quarterly payments went out of the FIC Partnership accounts at C&N Bank, either in round numbers representing 10% of the original inflows, or in repetitive instances where the same amount was paid on the same day to different investors.

**4. The Judgments in *SEC v. Hill* Confirm the Existence of the Ponzi Scheme.**

58.    The SEC alleged that the *SEC v. Hill* Defendants operated their scheme from 2019 to 2023. *SEC v. Hill* was based on an investigation by the SEC and the FBI. The Court has entered judgment against Hill and Shelly based on the facts stated in the SEC's complaint. The following factual allegations in the *SEC v. Hill* complaint confirm the existence of the Ponzi scheme:

a. "CETA has not built the CCUs beyond a few prototypes to show prospective investors, or leased the CCUs to any major oil and gas producers. … And bank records reveal that some investor distributions to date have been sourced from the money received from new or existing investors. Most critically, CETA has not generated revenues from any CCU operations, as represented to investors. Instead, CETA and Hill have used investor funds to pay quarterly "returns" to investors ,…" ECF 1, ¶ 3.

b. "…Shelly then transfers all or nearly all investor money from the Funds' accounts into other accounts held at Wells Fargo Bank in the name of 'Roy Hill Trust' ('Hill Trust Accounts')." ECF 1, ¶ 29.

c. "Once investor funds are transferred to the Hill Trust Accounts, CETA and Hill have not used the money to purchase and deploy CCUs or to obtain working interests in oil and gas fields, as they represented. Rather, CETA and Hill have used investor funds to, among other things, pay quarterly "returns" to investors, cover CETA's payroll expenses, make transfers to other accounts controlled by the Defendants, and pay personal expenses." ECF 1, ¶ 30

d. "Most critically, the bank records reflect that CETA and Hill have not generated revenue from business operations. Rather, the vast majority of money flowing into CETA's and Hill's accounts comes from transfers of investor funds from the Funds' bank accounts." ECF 1, ¶ 31.

59.    On Plaintiffs' information and belief, and based on evidentiary support that Plaintiffs reasonably believe they will develop after a reasonable opportunity for further

15

investigation and discovery, Plaintiffs adopt the foregoing allegations of the *SEC v. Hill* complaint as additional confirmation that the *SEC v. Hill* Defendants operated a Ponzi scheme.

**C. The Advisory Team Defendants' Involvement in the Ponzi Scheme.**

60.    Each of the FIC Partnerships distributed a Business Plan. As an example, the "OShares 04, LP Business Plan" described its "Advisory Team," made up of Hill, Rauld and Gertz.



Plaintiffs refer to Rauld, Gertz, and their firms Premier and ProVision, as the "Advisory Team Defendants." The Advisory Team Defendants made the Ponzi scheme possible.

**1. The Ponzi Scheme Misrepresentations.**

61.    The *SEC v. Hill* Defendants and the Advisory Team Defendants sponsored and made the untrue statements in the Business Plans. They also omitted material facts in the Business Plans. They misled investors by falsely stating that investors' returns were the result of business

revenues when in fact returns were funded by investors' contributions, and that the investors were actually investing in a Ponzi scheme. In addition to directly making the misrepresentations in the Business Plans, the Advisory Team Defendants also were aware that the *SEC v. Hill* Defendants made the same misrepresentations.

### a. The Untrue Statements in the Business Plans.

62.     In their Business Plans, the *SEC v. Hill* Defendants and the Advisory Team Defendants stated that investor funds would be used to build and deploy CCUs. A typical example is the "OShares 04, LP Business Plan" distributed to Plaintiffs Frechette, Krupey and Scharf in 2022.

63.     The OShares 04 Business Plan began with this statement:

"OShares 04, LP (OS 04) is a limited partnership created to own and operate a package of Mobile CO2TRANSMISSION Pipeline Units and CO2NOMAD Units as shown in the chart below (the "Carbon Capture Units"). These Carbon Capture Units will be leased to a natural gas producer to remove CO2 from gas streams at the wellsite and at the wellsite transmission pipelines. The use of this equipment on site at the well or the transmission pipeline will save the natural gas producer the cost of transporting gas for processing."

64.     The "package" of CCUs to be acquired referenced in the preceding statement is in the OShares 04 Business Plan under the heading "EQUIPMENT PACKAGE AND CAPITAL FUNDING":

**Equipment Package for Carbon Capture Shares 2021 LP**

| Type of Unit | # of Units | Cost | total |
|---|---|---|---|
| CO₂TRANSMISSION Pipeline | Up to 10 | $1,650,000 | $16,500,000 |
| CO₂NOMAD | 0 | $1,160,000 | $0 |
| Totals | | | $16,500,000 |

The next page expressly stated that investor funds will be used to acquire this "package" under the heading "Revenue Share Tax Benefit": "On this project, OShares 04 investors will contribute 82.5

shares of $200,000 to acquire the package of equipment in the chart above for a total of $16,500,000." [2]

65.    The OShares 04 Business Plan stated, under the heading "HOW CARBON CAPTURE UNITS WORK," that FIC "placed the first two (2) Carbon Capture Units at the end of 2019, sixteen (16) in 2020, fifty-two (52) units in 2021, and sixty (60) through July 2022."

66.    The OShares 04 Business Plan then stated that, based on past and ongoing leasing of CCUs, new investor funds would finance the leasing and deployment of additional CCUs to natural gas producers, and that revenues from this leasing would generate returns for the investors. It stated that "Carbon Capture Units will be leased to a natural gas producer to remove CO2 from gas streams at the wellsite and at the wellsite transmission pipelines."

67.    In describing "HOW CARBON CAPTURE UNITS WORK," the OShares 04 Business Plan stated:

"This is a disruptive new technology that is changing the way that natural gas is processed. This solvent will be utilized initially to capture CO2 out of pipelines to make the gas stream more marketable by capturing over 85 to 92.5% of the CO2. The CO2 is then absorbed into the solvent which the Company remains the owner. The Solvent with CO2 captured and absorbed is then reinjected into natural gas producer's oil and gas wells to improve production in that same geographic area."

68.    In the same section the OShares 04 Business Plan stated that the partnership

"will hire and enter into an operating agreement with Clean Energy Technology Association Inc. ("CETA") to secure the leasing contracts with the natural gas producer, maintain the Carbon Capture Units, handle all operations of the Carbon Capture Units, including liaising with the producer on our behalf, handling all accounting, providing us with the CETASolve,™ and actually inject the CETASolveTM into the wells on behalf of [the partnership]."

[2] The heading of the chart references a different FIC partnership. This shows that the OShares 04 Business Plan was the product of a "cut and paste" from prior Business Plans. The Business Plan distributed to Plaintiffs Frechette, Krupey and Scharf confirms the SEC's allegation that "the representations in the Offering Documents for each fund are similar or identical" is accurate. *SEC v. Hill*, ECF 1, ¶ 18.

18

69.     On Plaintiffs' information and belief, and based on evidentiary support that Plaintiffs reasonably believe they will develop after a reasonable opportunity for further investigation and discovery, all of the statements in Paragraphs 61-68, above, were not true. The CCUs were not in demand, natural gas producers were not using them, and there was no basis in fact to claim that new investor funds would be used to manufacture and place CCUs under leases with natural gas producers. By falsely stating that investor funds were being used to manufacture and place CCUs when in fact they were used to pay earlier investor the promised returns, the *SEC v. Hill* Defendants and the Advisory Team Defendants offered and sold the limited partnership units that were actually a Ponzi scheme.

70.     The OShares 04 Business Plan made numerous detailed statements about the revenues that leasing the CCUs would produce and how these revenues would fund distributions to the investors.

71.     Under the heading "ENHANCED OIL RECOVERY," the OShares 04 Business Plan falsely stated that the CCUs increased the gas producers' revenues and "the Company shares in the revenues of every additional barrel of oil and natural gas produced by the well."

72.     Under the heading "PARTNERSHIP," the OShares 04 Business Plan stated that the partnership would enter an operating agreement with CETA to lease and operate the CCUs.

"In return [the partnership] will get a percentage of owned production from the injected wells that they are to be paid a flat amount per barrel based on this economic model.

All revenue shall flow through CETA, who will take its share of the profits via a Management Fee from the revenues and provide OS 04 with its profit share.

[The partnership] will receive revenue from the CETA operating agreement that assigns to us the lease agreement with natural gas producer for the CO2removal from gas streams and the enhanced oil recovery. The lease revenue we receive is not a flat fee, but rather a percentage of additional oil and gas revenue generated by the natural gas producers using our saturated solvent for enhanced oil and gas

recovery (EOR). The baseline minimum revenue is calculated based on the volume of solvent used to absorb $CO_2$ from the gas stream and is paid quarterly. Every six months the actual amount of enhanced gas and oil production is tallied and the actual percentage above the baseline is paid to us."

73.    Under the heading "EQUIPMENT PACKAGE AND CAPITAL FUNDING," the

OShares 04 Business Plan included a section titled "Operator Contract and Revenue":

"As mentioned above, in addition to purchasing the equipment, OS 04 will enter into an operating contract with CETA to manage the various processes involved in this project. This contract will be the source of revenue for OS 04. CETA will earn revenue through the operation of the processes outlined below. The revenue will be shared with OS 04 with the following splits."

74.    The referenced "splits" are in a chart headed "Waterfall Revenue Split Chart":

"OS 04–65% / CETA–35% until OS 04 receives 1.5X of the original investment in revenue
OS 04–50% / CETA–50% until OS 04 receives 2.0X of the original investment in revenue
OS 04–35% / CETA–65% for the remaining life of the equipment."

75.    Next, in a section titled "Revenue Share Tax Benefit," the OShares 04 Business

Plan stated:

"The revenue will be treated as follows. After receiving the revenue from CETA based on the waterfall split chart above, the revenue will be split 75% for the 82.5 investor shares and 25% to the manager. Please refer to the proforma below for the amounts projected for each investor and the manager."

76.    The referenced "proforma" is at the bottom of the same page:

**"The following Proforma estimates 7 years of revenue**.

| Package Nomad/ Transmission | 1 | 2 | 3 | 4 | 5 | 6 | 7 | yr8-14 | 15 | |
|---|---|---|---|---|---|---|---|---|---|---|
| tot./estimated bill rev 1 co2 units | 11,700,000 | 11,700,000 | 9,811,546 | 8,885,540 | 6,800,000 | 6,800,000 | 6,800,000 | " " | 6,800,000 | $108,394,060 |
| revenue injection 75% | 8,775,000 | 8,775,000 | 6,983,688 | 4,789,595 | 4,725,000 | 4,725,000 | 4,725,000 | " " | 4,725,000 | $81,288,560 |
| investor 1 2.90% 3C 55 shares | 106,364 | 106,364 | 84,666 | 58,068 | 57,273 | 57,273 | 57,273 | " " | 57,273 | $986,437 |
| 1/2 share investor | 58,182 | 58,182 | 42,425 | 29,088 | 28,636 | 28,636 | 28,636 | " " | 28,636 | $492,719 |
| Proceeds inj acct consulting  25% | 2,925,000 | 2,925,000 | 2,327,883 | 1,596,558 | 1,575,000 | 1,575,000 | 1,575,000 | " " | 1,575,000 | $27,099,520 |
| investor dcc return | 53.16% | 53.18% | 42.33% | 29.99% | 28.64% | 28.64% | 28.64% | " " | 28.64% | |
| avg annual return | 22.85% | | | | | | | | | |

77.    The OShares 04 Business Plan then explained that the Proforma was based on

actual results from other CCU operations:

"The projected net income line is based on the revenues that Manager is currently receiving on other Nomad and Transmission Pipeline units in operation with

20

CETA. Of course, past performance is no guarantee of future results, but it is important for investor to know what the underlying revenue assumption is.

"From there, Manager has been advised by CETA that the Transmission units produce approximate 3 times the capacity and revenue of the Nomad units. Manager has not been able to independently confirm this number so there are no assurances these figures will be attained. In fact there may be a variance of 50% or more from these projections."

78.     The OShares 04 Business Plan made detailed false statements under the heading

"HOW THE CARBON CAPTURE UNIT REVENUE IS CALCULATED."

"The operating agreement with CETA is the source of revenue for the project. In this section we will explain how the baseline revenue is calculated. The baseline revenue is simply the minimum quarterly revenue we will receive. Ultimately, OS 04 receives a profit share of the excess oil profits the natural gas producer makes as a result of the use of our technology. The minimum baseline is credit against the profit share.

"First, there is a service fee of $20 per barrel of CETASolveTM based on daily usage rates and number of days of operation per quarter.

"Next, the baseline enhanced oil recovery revenue is calculated based on the average daily usage of CETAsolve barrels. The cost of a CETASolveTM barrel is $73.50 and a barrel of saturated CETASolveTM is sold for $96.50 which sets the baseline of the project's percentage of enhanced oil and gas production. Each $CO_2$ saturated CETAsolve barrel for enhanced oil recovery derives a baseline revenue of $23 per barrel.

"Then, every six months the project receives the percentage of enhanced recovery revenue earned above the baseline percentage. For our project, the estimated proforma revenue was based on actual revenue from Freedom Energy Funds 2 CO2NOMAD units and adjusted for the capacity differences.

"There are several factors that will affect revenue. The number of barrels used per quarter will vary. The concentration of $CO_2$ in the gas stream will determine the usage rate of CETAsolve. We will experience set-up and deployment time in our first quarter which will affect revenue. Normally, the equipment is operating an average of 81 days per quarter once the unit has been fully deployed. The saturated CETAsolve can also be recycled more than once in the enhanced oil and gas recovery process which also affect the revenue."

79.     The OShares 04 Business Plan repeated the statements about funding partnership

with revenues from the CCUs in the "Summary":

"To summarize, the capital raised by OS 04 will purchase a package of Mobile CO2TRANSMISSION Pipeline Units and CO2NOMAD Units and allow participation in an operating agreement managed by CETA.

"Through the management agreement, OS 04 will share revenue with CETA in a 65%, 50%, 35% split as previously described. After the waterfall split, the revenue will be split 75% for the 82.5 investor shares and 25% to the manager."

80.    On Plaintiffs' information and belief, and based on evidentiary support that Plaintiffs reasonably believe they will develop after a reasonable opportunity for further investigation and discovery, all of the statements by the *SEC v. Hill* Defendants and the Advisory Team Defendants in Paragraphs 70-79, above, were not true. There were no revenues from leasing the CCUs and no such revenues would fund distributions to the investors.

81.    By falsely stating in the Business Plans that investor returns were funded by revenues from leasing the CCUs when in fact they were funded by later investments, the Advisory Team Defendants successfully solicited the purchase of partnership interests and were motivated at least in part by a desire to serve their own financial interests and those of the *SEC v. Hill* Defendants.  They were links in the chain of selling the limited partnership units that were actually a Ponzi scheme.

**b. The Omissions in the Business Plans.**

82.    In the Business Plans, the *SEC v. Hill* Defendants and the the Advisory Team Defendants omitted the material fact that instead of using investor funds to purchase and deploy CCUs, investor funds were actually used to fund promised returns to earlier investors.

83.    For example, to be truthful, all of the statements from the OShares 04 Business Plan contained in Paragraphs 61-79, above, required the omitted facts that there were no revenues from leasing the CCUs and no such revenues would fund distributions to the investors. In light of the circumstances in which the Business Plan statements were made, these omissions were misleading.

22

84.     By omitting that there were no revenues from leasing the CCUs and no such revenues would fund distributions to the investors, and that in fact investor returns were actually funded by money paid by investors, the Advisory Team Defendants successfully solicited the purchase of partnership interests and were motivated at least in part by a desire to serve their own financial interests and those of the *SEC v. Hill* Defendants.  They were links in the chain of selling the limited partnership units that were actually a Ponzi scheme.

**2. Rauld and Premier Substantially Assisted the Ponzi Scheme.**

85.     In addition to their direct involvement in selling the limited partnership interests by means of the untruths and omissions described in Paragraphs 61-84, above, Rauld and his law firm Premier also substantially assisted the *SEC v. Hill* Defendants in carrying out the Ponzi scheme. This assistance took several forms.

86.     Rauld facilitated the Ponzi scheme by registering the FIC partnerships.

a.     A Certificate of Formation for a Texas limited partnership must be signed by its general partner. Tex. Bus. Org. Code § 3.004(b)(1). The existence of a Texas limited partnership commences when the certificate of formation takes effect. Tex. Bus. Org. Code § 3.001(c). Rauld signed the Certificates of Formation for the 59 FIC Partnerships that were organized under Texas law as the "Authorized Representative" of FIC, the general partner of each of these partnerships.

b.     Texas law also requires that a limited partnership from another state must register with the Texas Secretary of State to transact business in Texas. Tex. Bus. Org. Code § 9.001. Rauld signed the Application for Registration of a Foreign Limited Partnership for SLF Pipeline, Limited Partnership, as the "Authorized Representative" of FIC as the governing person of the partnership.

None of the 60 FIC Partnerships would have been able to do business in Texas, and 59 of them would not have existed, but for the assistance of Rauld. The Ponzi scheme would not have been able to use these 60 FIC Partnerships as the vehicle to obtain investors' money.

87.    As shown in detail in Paragraphs 46-50, above, and in Exhibit 1 to this Complaint, the timing of the creation of the FIC Partnerships shows that new partnerships were created around the end of each quarter to raise new funds to pay the promised quarterly returns to investors in the earlier partnerships. Rauld knew this because he was the individual who actually created the partnerships by signing and filing the Certificates of Registration.

88.    Rauld and Premier also served as the "Attorney and Legal Counsel" for the FIC Partnerships and serving on the "Advisory Team" for the partnerships.  By providing legal services and exercising professional judgment or discretion, Rauld and Premier facilitated the Ponzi scheme.

89.    Rauld and Premier prepared the documentation for the FIC Partnerships. For example, the sole investor in the proposed FIC Partnership named "KD Carbon Capture, LP" originally planned to purchase five CCUs from CETA, but decided to buy only three. On February 18, 2021, he emailed his banker to inform him that the loan amount would be reduced. "Basically, I am going to purchase 3 machines instead of 5. *Eric has agreed to the change and is going to get Mauricio to begin changing all the numbers in the documentation.*" (Emphasis added).

90.    Rauld and Premier promoted both themselves and the FIC Partnerships by appearing on the Business Plans for the FIC Partnerships as part of their "Advisory Team."

91.    Rauld and Premier promoted both themselves and the FIC Partnerships by participating in and speaking at in-person conferences, webinars and podcasts directed at potential investors misrepresenting the Ponzi scheme as a legitimate investment.

92.     One example was "The Tax Talk We've All Been Waiting For!" Emily Niebuhr of Full Circle Investments, one of Shelly's "Inner Circle" promoters, sent an email to Plaintiff Frechette on February 10, 2023. The subject was "REPLAY – Our Attorneys and Our CPA Explain How Carbon Capture Works For You!"

> Glynn,
>
> First off we'd like to say a huge thank you to Premier Law Group and ProVison. especially Mauricio Rauld, Bethany LaFlam, and Tim Gertz for facilitating this call !

(The email's references to Gertz and ProVision are set out in the next section.)

93.     The facts shown in the foregoing Paragraphs 46-50 and 61-92 give rise to a strong inference that Rauld and Premier perceived the risk that their assistance to the *SEC v. Hill* Defendants would facilitate untruthful or illegal activity. They acted with intent to deceive investors or reckless disregard for the truth or the law.

**3. Gertz and ProVision Substantially Assisted the Ponzi Scheme.**

94.     In addition to their direct involvement in selling the limited partnership interests by means of the untruths and omissions described in Paragraphs 61-84, above, Gertz and ProVision also substantially assisted the *SEC v. Hill* Defendants in carrying out the Ponzi scheme. This assistance took several forms.

95.     Gertz and ProVision served as the certified public accountant for the FIC Partnerships and serving on the "Advisory Team" for the partnerships.  By providing accounting services and exercising professional judgment or discretion, Rauld and Premier facilitated the Ponzi scheme.

96.     Gertz and ProVision knew that quarterly reports would be distributed to investors. They knew that the investors had been given the Business Plans identifying Gertz and ProVision

as the "CPA" for the partnerships. They knew that the investors had been given other offering documents assuring investors that FIC would act on the advice of the partnerships' certified public accountants, namely Gertz and ProVision. In short, they knew that investors would rely on the reports that they prepared and would believe them because they had the imprimatur of an identified certified public accountant.

97.    Plaintiffs received quarterly reports that accompanied the quarterly payments to each investor. These false and misleading quarterly reports were, called "Fund Scorecards."

98.    Plaintiff Goldovsky received a Fund Scorecard along with his quarterly payment from SYN 09, LP for the quarter ended March 31, 2023. It stated an "Equipment In Service Date" of March 31, 2022. The "Fund Cash Flow Summary" reports "Production Revenue Earned from CETA" as $343,759 for the quarter and $905,666 from the fund's inception. The Fund Cash Flow Summary reports a bottom line "Return After Cash Reserve & FIC Profit Share" of $140,00 for the quarter and 281,000 from the fund's inception. The "Fund Balance Sheet Summary" shows equipment valued at $2,810,000.

99.    Plaintiffs Frechette, Krupey and Scharf received Fund Scorecards with the payments from OShares 04, LP for the first quarter of 2023. These stated an "Equipment In Service Date" of November 24, 2022. The "Fund Cash Flow Summary" reports "Production Revenue Earned from CETA" as $1,300,384 for the quarter and "Return After Cash Reserve & FIC Profit Share" of $975,288. The "Fund Balance Sheet Summary" has an equipment value of $16,500,000.

100.    On Plaintiffs' information and belief, and based on evidentiary support that Plaintiffs reasonably believe will develop after a reasonable opportunity for further investigation and discovery, these Fund Scorecards were false in at least three respects:

a.    Each Fund Scorecard stated, after the name of the partnership, an "Equipment in Service Date." Because no CCUs were actually in service, these "Equipment in Service Dates" were false.

b.    The first part of each Fund Scorecard was a table titled "Fund Cash Flow Summary." The first line in this table states a dollar amount for "Production Revenue Earned from CETA" and the last line states a dollar total for "Return After Cash Reserve & FIC Profit Share." Because there was no production revenue, these "Fund Cash Flow Summary" entries were false.

c.    The second part of each Fund Scorecard was a table titled "Fund Balance Sheet Summary." The largest amount in the "Assets" section is for "Equipment, Net of Depreciation." Because the partnerships did not actually own this equipment and the CCUs had no value, these asset values were false.

101.    Gertz and ProVision, as the accountants for the FIC Partnerships, also knew when the partnerships were established and when they started receiving investor funds. As shown in detail in Paragraphs 46-50, above, and in Exhibit 1 to this Complaint, the timing of the creation of the FIC Partnerships shows that new partnerships were created around the end of each quarter to raise new funds to pay the promised quarterly returns to investors in the earlier partnerships.

102.    The Business Plans and other offering documents refer to tax benefits and how the claimed placement and operation of the CCUs would justify the tax benefits that FIC promote its sales of partnership interests. Gertz and ProVision prepared tax returns and other tax calculations for the FIC Partnerships. They knew that tax benefits were a significant selling point for the partnerships.

103.    For example, the OShares 04 Business Plan includes very specific representations about the tax benefits of an investment and the basis for the tax benefits. In the same "PARTNERSHIP" section with the equipment chart and Proforma (*see* Paragraphs 64 and 76, above), this statement was made under the Heading "Tax Benefit":

"There will be a bonus depreciation of the full cost of the equipment in the first year. These benefits will flow to the investor. This should allow for a deduction against ordinary or W-2 income. We recommend that you check with your accountant on this issue. In order for the full deduction to be realized Sponsor will not charge any fees or expenses to OS 04. Those expenses will be borne by the Sponsor through its managing general partner's share. There will be a depletion allowance for the solvent and the oil and gas produced from the enhanced oil recovery process. The depletion allowance will go to the benefit of the Sponsor to offset the startup and management costs of the fund which includes attorney and accounting fees."

104.    After the Proforma at the bottom of that page, the OShares 04 Business Plan states:

"Note that the average annual return does not include the significant tax benefits that should arise from this investment, specially when the investor personally guarantees the CETA loan. The tax benefit should increase your actual return significantly, but will depend on each investor's personal circumstances."

105.    The next section of the OShares 04 Business Plan is titled "REVENUE SHARES, LEVERAGE AND TAX BENEFIT." This section explains that the partnership's business operations will give the partnership a "working interest" that justifies various tax benefits.

106.    Under the heading "CETA's Lease/Management Agreement with the Producers," the OShares 04 Business Plan states:

"There are several pieces to the full operation of the CETAs lease/management agreement. The following describes the lease/management agreement and establishes a working interest in the oil production.

"CETA begins with a master lease/management agreement with the producers who will be utilizing our Carbon Capture Unit. Portions of that lease/management agreement are assigned to OS 04 which establishes OS 04's working interest in all resources from the commencement of placing the Carbon Capture Unit with the Gas and CETASolveTM into operations.

"Because OS 04 owns the solvent all the way through the process, owns the equipment subject to a revenue sharing operating agreement with CETA on profit split, owns an interest in the added production from the wells that their CO2 embedded solvent is injected, and has operating agreements on both ends, and has marketable shale oil product ownership for sale, then a working interest is established.

"These operating agreements give OS 04 and its general partners' liability exposure so that OS 04's transaction with CETA should qualify for both a working interest, equipment write-offs for depreciation, and depletion on the percentage of oil product generated from the wells in which they participate.

"To assist your tax professional, we have provided the following information on how the various provisions in the tax code apply to this project:

"**Law:** *Section 469(c)(3) exempts 'any working interest in any oil or gas property which the taxpayer holds directly or through an entity which does not limit the liability of the taxpayer with respect to such interest" from being considered a "passive activity." Further, Sec. 469(c)(4) states that the prior sentence "shall be applied without regard to whether or not the taxpayer materially participates in the activity." Additionally, Under Reg § 1.469-1(e)(4)(iv) a working interest in oil or gas property is defined by reference to the depletion rules. These rules cover "minerals in place," including ores of metals, coal, oil, gas, and all other natural metallic and nonmetallic deposit.'"*

107. The "REVENUE SHARES, LEVERAGE AND TAX BENEFIT" section concludes with a "Tax Benefits Summary":

- "Per Manager's tax professional, 100% investment is deductible against ordinary income in year 1

- "there is an annual 15% depletion allowance on the solvent, oil, and gas revenue. This benefit will be allocated to the managing partner's share to offset project expenses."

108. Tax benefits are also part of the "Summary" of the OShares 04 Business Plan:

"Finally, because of the structure of the lease/management agreement with CETA as operator and the ownership of the equipment and the other means of production, investors of OS 04 will receive substantial tax benefits against ordinary income."

109. On Plaintiffs' information and belief, and based on evidentiary support that Plaintiffs reasonably believe they will develop after a reasonable opportunity for further

29

investigation and discovery, all of these tax benefit statements were false because there were no equipment purchases, business operations or revenues. But the extensive representations about tax benefits made Gertz and ProVision at least generally aware that tax considerations were a factor in selling interests in the FIC Partnerships.

110.    Tax documents prepared by ProVison were used to promote the FIC Partnerships. For example, on May 9, 2022, Emily Niebuhr of Full Circle Investments, one of Shelly's "Inner Circle" promoters, sent an email to Plaintiffs Frechette and Scharf. She stated, in part, "there are some excellent benefits to this, one being the tax incentives…. Attached you will find our current business plan as well as a sample K-1 to review." The sample K-1, dated March 6, 2020, was issued to Shelly for his interest in Freedom Energy Fund LP. The cover page identifies ProVision as the preparer.

111.    The K-1 reports Shelly's $300,000.00 share of the partnership's ordinary business loss from "Shale Oil Extraction." Using a 2020 K-1 to promote partnerships two years later was false and misleading and was intended to convince Frechette and Scharf that the new partnerships would also be in the "Shale Oil Extraction" business.

112.    The Freedom Energy Fund LP was the very first partnership created by Shelly, FIC and Rauld to begin the Ponzi scheme. The March 2020 K-1 shows that ProVision and Gertz participated in the scheme from the beginning.

113.    Gertz assisted the marketing of the FIC Partnerships by appearing on webinars, podcasts and phone calls to explain the tax benefits as the Partnerships' CPA. He featured prominently in the "REPLAY – Our Attorneys and Our CPA Explain How Carbon Capture Works For You!" that was the subject of "Inner Circle" promoter Emily Niebuhr's February 10, 2023, email to Plaintiff, described in Paragraph 92, above:

**The Tax Talk We've All Been Waiting For!**

Glynn,

First off we'd like to say a huge thank you to Premier Law Group and ProVison. especially Mauricio Rauld, Bethany LaFlam, and Tim Gertz for facilitating this call !

As Brad and I continue to fund carbon capture funds with the help from investors, more and more CPA's get involved, which in turn creates more and more great questions about carbon capture and the tax benefits.

This call with Tim Gertz, our CPA for all of our carbon capture funds, answers the majority of the frequently asked questions about how investing in carbon capture can help you!



Emily Niebuhr followed this email with another to Plaintiffs Frechette and Scharf the next day, February 11, 2023. "It's great to hear from you guys and I'm glad that the video with our CPA was informative.  We're really happy to have that as a resource for investors now."

31

114.     Gertz also answered specific investor tax questions. For example, on May 24 and 25, 2022, Frechette's accountant emailed a request for an explanation of the tax treatment of Frechette's investment: "Please explain how the Carbon Capture Investment is not subject to the Business Income Limitation." Frechette forwarded this request to Shelly. The next day, Shelly sent Frechette a clarifying question from Gertz:

> "Subject: Re: Eric…from my CPA
>
>> "This was his response. Obviously if anyone misspoke it was me. Does this response answer your question? Happy to pass on a fillip question.
>>
>> Eric,
>> It is as all flow through entities are?   The investor must have misspoken?
>>
>> Thanks,
>> Timothy B. Gertz, CPA
>> Partner"

Frechette then asked Shelly: "So Timothy is saying that the investment 'would be' subject to the limitation, correct?" Shelly got an answer from Gertz and forwarded it to Frechette:

> "Eric,
>
> Losses from flow through (partnerships, S Corps, sole proprietorships) entities can only offset 260,000(single)/520,000(married) of W-2,1099R, and portfolio income per year.  This was enacted in 2017 to pay for portions of that tax bill and is in effect until 2026.
>
> Thanks,
> Timothy B. Gertz, CPA
> Partner"

115.     Gertz and ProVision also promoted both themselves and the FIC Partnerships by appearing on the Business Plans for the FIC Partnerships as part of their "Advisory Team" misrepresenting the Ponzi scheme as a legitimate investment.

116.    The facts shown in the foregoing Paragraphs 41-84 and 94-115 give rise to a strong inference that Gertz and ProVision perceived the risk that their assistance to the *SEC v. Hill* Defendants would facilitate untruthful or illegal activity. They acted with intent to deceive investors or reckless disregard for the truth or the law.

**D. The Bank Defendants' Involvement in the Ponzi Scheme.**

117.    The Bank Defendants were essential to the Ponzi scheme. CETA's business accounts were at Wells Fargo. Hill opened "Roy Hill Trust" accounts at Wells Fargo. Shelly and FIC established a separate bank account for each of the 60 FIC Partnerships at C&N Bank.

**1. The Bank Defendants Were Aware of the Ponzi Scheme.**

118.    As detailed in Paragraphs 42-45 and 51-57, above, investor funds were shuffled through these accounts to give investors the impression that their returns were based on CETA business revenues, when in fact the returns were sourced from new or existing investors. In addition, the Bank Defendants saw that no amounts consistent with business operation revenues were deposited in any of the CETA business accounts at Wells Fargo, the "Roy Hill Trust" accounts at Wells Fargo, or the FIC Partnership accounts at C&N Bank. The Bank Defendants saw and facilitated cash flows among the bank accounts that made the Ponzi scheme possible.

**a. The Bank Defendants Are Required by Law to Know their Customers and the Customers' Banking Behavior.**

119.    Federal law requires banks to know their customers and understand their customers' banking behavior. See 31 C.F.R. § 1020.220(a)(1), (2). The Bank Defendants are required to collect information about the holder of each account. In fact, in other Ponzi scheme litigation, Wells Fargo has admitted that it "has certain obligations to know its customers" and that it "complies with those obligations."

120.     The Bank Defendants must also conduct customer due diligence to gauge the risk of fraud, money laundering, terrorist financing, or other illicit account uses. *See*, *e.g.*, 31 CFR § 1020.210. They are required to understand the types of transactions in which their customers are likely to engage and remain vigilant for transactions that may be suspicious. These laws impose on the Bank Defendants a duty to understand the nature and purpose of their customer relationships and develop a customer risk profile. This information must then be used for ongoing monitoring of its customers' transactions.

121.     Such duties form part of the federally mandated compliance with Anti-Money-Laundering (AML) laws. Federal regulations, including 12 C.F.R. § 21.21, require the Bank Defendants to develop, administer and maintain a program to ensure compliance with federal AML laws. The program must be approved by a bank's board of directors and: (1) provides a system of internal controls to ensure compliance at all times, (2) provides for independent testing of the bank's ongoing compliance, (3) designates an individual to coordinate and monitor compliance, and (4) provides training for appropriate personnel. In other Ponzi scheme litigation, Wells Fargo has admitted that it "has certain Anti-Money Laundering obligations" and that it "complies with those obligations."

122.     The Bank Defendants must also implement their customer identification and due diligence programs in a manner that allows them to (i) know who is in charge of each account, (ii) the nature and purpose of the account and the customer's business, and (iii) the anticipated transactions that will be processed through the account, together with expected volume and frequency.

123.     Wells Fargo also maintains a customer due diligence program to assist in predicting the types of transactions, dollar volume, and transaction volume each customer is likely to conduct,

providing a means of identifying unusual or suspicious transactions for each customer. The customer due diligence program allows the bank to maintain awareness of the financial activity of its customers and the ability to predict the type and frequency of transactions in which its customers are likely to engage. In other Ponzi scheme litigation, Wells Fargo has admitted that "it employs electronic systems, policies and procedures, training, and other resources to conduct due diligence and detect suspicious activity pursuant to state and federal law and regulation."

124.    Wells Fargo designates a senior bank official to be the compliance officer responsible for coordinating and monitoring compliance with federal AML laws. The compliance officer, in turn, designates an individual at each office or branch to monitor the bank's day-to-day compliance, including the offices for the Hill Trust accounts. In other Ponzi scheme litigation, Wells Fargo has admitted that "it has bank employees responsible for coordinating and monitoring Anti-Money Laundering compliance."

125.    The Federal Financial Institutions Examination Council ("FFIEC") sets standards and guidelines for the Bank Defendants to comply with their AML obligations. The FFIEC BSA/AML Manual includes "Appendix F - Money Laundering and Terrorist Financing Red Flags" (attached to this Complaint as Exhibit 2), which describes certain "red flags" that indicate possible money laundering schemes and other misconduct requiring further inquiry. Examples of these suspicious indicia relevant to the *SEC v. Hill* Defendants and the FIC Partnerships' banking activities include:

  a)  "Many funds transfers are sent in large, round dollar, hundred dollar, or thousand dollar amounts."

  b)  "Funds transfer activity is unexplained, repetitive, or shows unusual patterns."

  c)  "Unusual use of trust funds in business transactions or other financial activity."

d) "A large volume of … funds transfers is deposited into … an account when the nature of the accountholder's business would not appear to justify such activity."

e) "Goods or services purchased by the business do not match the customer's stated line of business."

f) "Goods or services, if identified, do not match profile of company provided by respondent bank or character of the financial activity…."

g) "Payments or receipts with no apparent links to legitimate contracts, goods, or services are received."

h) "Payments to or from the company have no stated purpose, do not reference goods or services, or identify only a contract or invoice number."

i) "Funds transfers contain limited content and lack related party information."

j) "Funds transfers are sent or received from the same person to or from different accounts."

k) "Unusual transfers of funds occur among related accounts or among accounts that involve the same or related principals."

l) "Multiple high-value payments or transfers between shell companies with no apparent legitimate business purpose."

m) "Purpose of shell company is unknown or unclear."

n) "Customer has established multiple accounts in various corporate or individual names that lack sufficient business purpose for the account complexities or appear to be an effort to hide the beneficial ownership from the bank."

Ex. 2 at pp. 3-5, 11.

### b. Wells Fargo Maintains Sophisticated Internal Controls and Programs to Detect Fraud.

126.   Wells Fargo collects and maintains information about its customers and their banking behavior in order to, among other things, detect and prevent money laundering and fraud and to protect itself from third party liability and reputational injury. For this purpose, Wells Fargo maintains procedures to determine the identity of each customer, 31 C.F.R. §§ 1020.220(a)(1), (2), and to collect information about the holder of each account, 31 C.F.R. § 1020.220(a)(2). When an

entity rather than an individual opens an account, the bank obtains information about the individual who will control the account. 31 C.F.R. § 1020.220(a)(2)(ii)(C). The information that Wells Fargo collects about new business account clients includes the purpose and nature of the business, anticipated activity in the account (e.g., volume, value (number and dollar), and type of transaction), where the customer expects to transact business, and the products and services commonly used by the customer.

127.    Using the information collected, as well as external resources like internet search engines and public and commercial record databases, Wells Fargo creates an initial client profile and assigns a compliance-related risk rating. Neither the profile, nor the risk rating, is final or static. When Wells Fargo becomes aware that customer information has materially changed, its internal controls require updating that information and, where appropriate, reassessing the customer's risk profile or rating. One of the ways in which the bank becomes aware of such changes is when the customer's transactions appear inconsistent with the bank's understanding of the nature and purpose of the account.

128.    Wells Fargo also maintains internal controls to ensure ongoing compliance with federal AML law. These include independent testing of the bank's compliance, regular monitoring of compliance, and training of personnel. These controls also include customer due diligence programs to prevent and detect money laundering.

129.    Through these programs, Wells Fargo obtains information that gives it an understanding of the unique financial activity of its customers. Likewise, Wells Fargo can predict the type and frequency of transactions in which its customers are likely to engage, including the dollar volume and transaction volume typical of each account. This knowledge is used to identify unusual and suspicious transactions.

**c. Wells Fargo Enhanced its Internal Control Mechanisms Before the Ponzi Scheme Began.**

130.    From 2011 to 2017, Wells Fargo incurred fines and was subject to other disciplinary measures from federal agencies for its compliance failings, including those due to deficiencies in its AML oversight.

131.    In 2013, in response to regulatory scrutiny, Wells Fargo reevaluated its systems. Following an audit, the bank adopted a risk-management framework and made other substantive changes, including realigning over 5,000 employees. The bank also devoted substantial resources to developing and implementing surveillance technology, including artificial intelligence software, designed to enhance Wells Fargo's account-transaction monitoring system.

132.    Wells Fargo's deficient BSA and AML program also resulted in a Consent Order (the "2015 Consent Order") by the U.S. Office of the Comptroller of the Currency in In re Wells Fargo, No. AA-EC-201-79 (Nov. 19, 2015). The 2015 Consent Order was based on findings of "deficiencies in an internal control pillar of the Bank's program for Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') compliance covering the Wholesale Banking Group line of business." The OCC found that Wells Fargo's BSA/AML customer risk assessment practices were ineffective, its customer due diligence practices were unsatisfactory, and its monitoring and oversight practices were inadequate.

133.    The 2015 Consent Order required, among other things, the establishment of a compliance committee, a comprehensive BSA/AML action plan, a comprehensive risk assessment of customer relationships, and development of appropriate customer due diligence and enhanced due diligence policies, procedures, and processes.

134.    By 2016, a Wells Fargo executive testified to Congress that the bank's policies, procedures, and internal controls were effective and compliant with AML laws.

135.    Following termination of the 2015 Consent Order in January 2021 (and another consent order relating to improper retail sales practices), Wells Fargo issued statements addressing its AML-related procedures and infrastructure. Specifically, it confirmed that it "undertook significant work to remedy the deficiencies that gave rise to the consent order and to enhance its BSA/AML compliance program" and suggested that it had built "the right risk and control infrastructure."

136.    Wells Fargo later reaffirmed its commitment to meeting regulators' expectations for risk management and controls. Wells Fargo further touted that, since 2019, it "[l]aunched an enterprise-wide Risk and Control Self-Assessment program to assess operational risks and controls and ultimately to design additional mitigating controls as appropriate" and "[i]mplemented a new incentive plan for bank branches that is governed by stronger oversight and controls, and focused on customer relationships."

137.    Thus, by the time the Ceta and the Roy Hill Trust opened their Wells Fargo accounts, the bank's system of internal controls, including its company-wide compliance awareness protocols, risk management framework, and monitoring technology portfolio, provided Wells Fargo with the tools to readily detect the misuse of their accounts by the *SEC v. Hill* Defendants.

138.    Wells Fargo makes employees' compliance with banking regulations, and knowledge of AML guidelines, conditions of their employment, and Wells Fargo incorporates these concepts into job descriptions and performance evaluations.

139.    The bank gives AML training to all personnel whose duties may require such knowledge, including tellers and wire room personnel, enabling them to detect money laundering and fraud.

140.    In addition, supervising personnel, specially designated by Wells Fargo's chief compliance officer, oversee the day-to-day implementation of the bank's risk management framework at the individual branches. In other Ponzi scheme litigation, Wells Fargo has admitted "that it has employees who oversee the day-to-day implementation of the bank's risk management framework at the individual branches."

141.    The Wells Fargo Code of Ethics and Business Conduct ("WF Code of Ethics," attach ed to this Complaint as Exhibit 3). reinforces the bank's compliance policies, and orders employees to "complete all customer due diligence requirements [,] be alert to—and report— suspicious activity," and sets the policy of "completing all required …. Compliance training on a timely basis." The Code of Ethics also states that the bank has adopted policies to comply with applicable laws relating to money laundering. *Id.*

142.    Wells Fargo bankers are trained to ask at least 20 fact-finding questions when opening new accounts. These questions include the use of the account and the customer's long-term intentions for the account. New accounts that are less than 60 days old are also subject to greater scrutiny and limitations, including mandatory review by additional personnel.

143.    A Wells Fargo banker processing an outgoing wire transfer is trained to ask the customer questions designed to detect possible money-laundering, including the purpose of the transaction, and the nature of the relationship between the parties. Wires between $25,000 and $100,000 automatically prompt personnel to use a checklist to evaluate the transaction. A customer service manager who approves outgoing wires often conducts a secondary review, confirming that the checklist questions were adequately addressed. Wire transactions above $100,000 require additional approval of a regional Wells Fargo employee, and transactions over $500,000 also require branch manager authorization.

40

144.     A similar process is in place for checks. Before the bank credits a large check, multiple bankers review the check image for potential indicators of fraud or other misconduct, including unusual notations and disparities between the location of the payor, the payee, and the depositor. When these efforts detect unusual activity, employees examine the account more fully, including reviewing the account's transaction history and consulting with employees who opened or who have worked on the account.

145.     Various branch-level personnel also regularly review Balance Fluctuation Reports. These reports highlight substantial balance fluctuations and list the account activity in the accounts covered by the reports.

### d. Wells Fargo Has its Own Artificial Intelligence Platform to Monitor Customer and Account Activity.

146.     Complementing these human efforts is Wells Fargo's advanced transaction monitoring software portfolio, which includes Actimize, an artificial intelligence and data analytics software platform. Actimize markets its product as "entity-centric," and capable of revealing hidden connections and relationships between transacting parties across multiple accounts and transactions.

147.     Actimize automatically reviews transactions against customers' backgrounds and transaction histories, compares account activity against AML and other compliance red flags, and automatically detects and analyzes abnormal or risky behavior. When the software identifies activity warranting further review or escalation, it alerts bank personnel.

148.     In other Ponzi scheme litigation, Wells Fargo has admitted "that it uses software to monitor transactions in demand deposit accounts, and at one time used Actimize."

**e. C&N Bank Was Aware of the Timing of the Creation of the FIC Partnerships.**

149.    In carrying out its obligation to know its customers, C&N Bank knew when the FIC Partnerships were established. They knew that FIC was the general partner of each of the partnerships. They knew that FIC opened a new account for each partnership at or near the time it was established and when they started receiving investor funds. As shown in detail in Paragraphs 46-50, above, and in Exhibit 1 to this Complaint, the timing of the creation of the FIC Partnerships shows that new partnerships were created around the end of each quarter to raise new funds to pay the promised quarterly returns to investors in the earlier partnerships.

**2. The Bank Defendants Substantially Assisted the Ponzi Scheme.**

150.    A Ponzi scheme cannot operate without banks to receive and pay out investor funds. The *SEC v. Hill* Defendants and the Advisory Team Defendants could not have carried out the Ponzi scheme without the active assistance of the Bank Defendants. The Bank Defendants tracked the account activity of CETA, the Hill Trusts and the FIC Partnerships and saw that the accounts were being used to operate a Ponzi scheme. The Bank Defendants nevertheless accepted hundreds of millions of dollars into the accounts, and then executed transactions through which new and existing investor funds were used to pay earlier investors, with no legitimate underlying business transactions or revenues. Instead of terminating the accounts in response to these misuses, the Bank Defendants carried out the Ponzi scheme.

151.    The facts shown in the foregoing Paragraphs 41-84 and 117-149 show that the Bank Defendants had at least a general awareness of the Ponzi scheme. These facts give rise to a strong inference that the Bank Defendants perceived the risk that their assistance to the *SEC v. Hill* Defendants would facilitate untruthful or illegal activity. They acted with intent to deceive investors or reckless disregard for the truth or the law.

42

**E. The Unregistered Securities.**

152.    When CETA sold CCUs to investors, including the FIC Partnerships, the

transaction involved a bundle of agreements, including:

- a Bill of Sale for the CCUs purchased,

- an "Operator's Agreement" in which CETA was the "Operator" and the other parties were "Non-Operators" and "Working Interest Owners" with no right to control or manage the operations.

- A Lease in which CETA is the Lessor and the investor is the Lessee;

- an "Exhibit A-1" to the Lease conveying "[a]n undivided lease ownership interest in wells and oil and gas mineral reserves or units that may be owned or acquired by undersigned Lessor…," and

- an "Exhibit A" identified in "Exhibit A-1" listing "WOLFCAMP SHALE TEXAS COUNTIES THAT MAY BE UTILIZED FOR CO2 ABSORPTION, CAPTURE AND INJECTION OF MOBILE UNITS."

153.    The interests sold by the *SEC v. Hill* Defendants, including the interests in the FIC

Partnerships, were securities because:

> a) the interests in the FIC Partnerships were limited partner interests in a limited partnership;

> b) the Bills of Sale were a form of commercial paper;

> c) the Operator's Agreements, Lease and Exhibits A-1 and A represented interest in or under an oil, gas, or mining lease, fee or title.

154.    The interests sold by the *SEC v. Hill* Defendants, including the interests in the FIC

Partnerships, were also securities because the combined documents were investment contracts.

> a) they involved investments of money in a common enterprise with profits to come solely from the efforts of others, and

> b) they involved (i) a contract, transaction, or scheme through which a person pays money (ii) to participate in a common venture or enterprise (iii) with the expectation of receiving profits, (iv) under circumstances in which the failure or success of the enterprise, and thus the person's realization of the expected profits, is at least predominately due to the entrepreneurial or managerial, rather than merely ministerial or clerical, efforts of others.

43

155.    In addition, the *SEC v. Hill* Defendants described the interests in the FIC Partnerships as securities when they offered and sold them.

156.    No person has applied to the Texas Securities Commissioner to register any of the interests sold by the *SEC v. Hill* Defendants, including the interests in the FIC Partnerships. The Texas Securities Commissioner has not issued a permit qualifying any of the interests sold by the *SEC v. Hill* Defendants for sale.

**1. The Offers and Sales of the Unregistered Securities.**

157.    The *SEC v. Hill* Defendants offered and sold the unregistered securities to investors.

158.    The Advisory Team Defendants also offered and sold the unregistered securities to investors, by participating in the Business Plans for the FIC Partnerships and successfully soliciting the purchase of the unregistered securities motivated at least in part by a desire to serve their own financial interests or the financial interests of the *SEC v. Hill* Defendants. They were "links in the chain" of the process of selling interests in the FIC Partnerships.

**2. The Promotion of the Unregistered Securities.**

159.    The *SEC v. Hill* Defendants and the Advisory Team Defendants offered and sold the unregistered securities by means of public solicitation.

160.    The SEC has alleged in its Complaint, and Hill and Shelly have admitted, that the unregistered securities were promoted by means of public solicitation:

> "Shelly and Hill have actively promoted investments in the Funds through, among other means: (i) CETA and FIC websites; (ii) webinars hosted by Shelly; and (iii) quarterly and other periodic updates that Shelly, and in some cases, Hill, provides to investors." *SEC v. Hill*, ECF 1, ¶ 23.

> "On CETA's and FIC's websites, potential investors can access investment marketing materials, including but not limited to, private placement memoranda, Fund subscription documents, and wiring instructions. These documents are

generally available to the public to download, without password protection or the need to request the materials." ECF 1, ¶ 24.

"The webinars are available as videos on YouTube, where FIC maintains a channel. Several of these videos, which feature Shelly (and at times, Hill) speaking about the advantages of investing in the Funds and display marketing materials, have hundreds of views each. The periodic updates to investors contain information about CETA's performance, operations, and CCU deployment activity across multiple Funds, as well as information about FIC's ongoing fundraising activity." ECF 1, ¶ 25.

"In addition to Hill's and Shelly's" direct marketing activities, investments in the Funds have been, and continue to be, promoted and sold by others. According to Shelly, at least six promotors have raised money from investors using their own websites." ECF 1, ¶ 26.

161.    On Plaintiffs' information and belief, and based on evidentiary support that Plaintiffs reasonably believe they will develop after a reasonable opportunity for further investigation and discovery, Plaintiffs adopt the foregoing allegations of the *SEC v. Hill* complaint that the unregistered securities were promoted by means of public solicitation.

162.    Plaintiffs' experience confirms that the FIC partnerships were marketed by other promoters as alleged by the SEC in Paragraph 26 of its complaint. A friend who was investing in an FIC partnership introduced Plaintiffs Frechette and Scharf to Emily Niebuhr and Brad Niebhur. The Niebuhrs did business as "Full Circle Investments" and were in Shelly's "Inner Circle" of promoters. Frechette and Scharf had no pre-existing relationship with the Niebuhrs or Full Circle Investments.

163.    In May 2022, Emily Niebuhr sent several emails to Frechette and Scharf. The emails represented that "there are some excellent benefits to this, one being the tax incentives, and the other being cash flow." She attached a variety of documents from older partnerships to represent that Frechette and Scharf could expect similar results, including business plans and the sample K-1 dated March 6, 2020 issued to Shelly for his interest in the Freedom Energy Fund, LP

partnership, described in Paragraphs 110-112, above. She included links to YouTube videos and recorded presentations and calls, such as the "Tax Talk We've All Been Waiting For!" described in paragraphs 92 and 113, above.

164.    In addition, as shown in Paragraphs 91-92 and 113, above, the Advisory Team Defendants promoted the FIC Partnerships by participating in and speaking at in-person conferences, webinars and podcasts directed at potential investors.

**3. The Advisory Team Defendants Were Aware of and Assisted Sales of Unregistered Securities.**

165.    The Advisory Team Defendants knew that the interests in the FIC Partnerships were unregistered securities as shown in Paragraph 156, above.

166.    In addition to their direct involvement in selling the unregistered interests in the FIC Partnerships as alleged in Paragraph 158, above, the Advisory Team Defendants substantially assisted the *SEC v. Hill* Defendants in offering and selling those unregistered securities. Plaintiffs reallege and incorporate herein by reference the allegations of Paragraphs 85-116, above.

**4. The Advisory Team Defendants Acted with Intent or Reckless Disregard.**

167.    The facts shown in the foregoing Paragraphs 41-116 give rise to a strong inference that the Advisory Team Defendants perceived the risk that their assistance to the *SEC v. Hill* Defendants would facilitate untruthful or illegal activity. They acted with intent to deceive investors or reckless disregard for the truth or the law, by rendering the foregoing assistance to the *SEC v. Hill* Defendants in the face of a perceived risk that the assistance would facilitate untruthful or illegal activity.

**F. Offers and Sales of Securities by Means of Misrepresentations.**

168.    As Plaintiffs have shown in Paragraphs 152-155, above, the interests sold by the *SEC v. Hill* Defendants, including the interests in the FIC Partnerships, were securities.

**1. Untruths and Omissions Were Used to Offer and Sell the Securities.**

169.     In addition to selling unregistered securities, the *SEC v. Hill* Defendants and the Advisory Team Defendants sold the securities by means of untruths and omissions.

**a. The Ponzi Scheme Misrepresentations Were Also Used to Sell the Securities.**

170.     Plaintiffs have shown in Paragraphs 61-84, above, that the *SEC v. Hill* Defendants and the Advisory Team Defendants misrepresented the interests sold to investors as a legitimate investment when they were actually a Ponzi scheme.

171.     The *SEC v. Hill* Defendants and the Advisory Team Defendants also offered and sold the securities by means of each of the untruths and omissions described in Paragraphs 61-84 and 97-115, above, that the existing FIC partnerships had purchased and placed CCUs, that proposed new partnerships would also purchase and place CCUs, that the CCUs were being leased, that the CCU leases were producing revenues, that the revenues were funding distributions to investors, and that business operations were creating tax benefits for the investors. Plaintiffs reallege those Paragraphs as independent untruths and omissions by which the securities were offered and sold.

**b. Untrue Statements that the Carbon Capture Technology Was Patented.**

172.     The *SEC v. Hill* Defendants and the Advisory Team Defendants represented to investors that the CETA Carbon Capture Technology was patented. For example, in the OShares 04 Business Plan, they stated that "The Carbon Capture Units represent patented technology designed and developed by CETA," and "The Carbon Capture Units are a patented technology operated by CETA."

173.     The statements that CETA's Carbon Capture Technology was patented were untrue statements of material fact. The technology is not the subject of any patents. Espace.net is an

47

internet search service with readily searchable access to the European Patent Office's worldwide patent database. A search of patents referencing CETA showed only three patents:

- Hill, *et al.*, COOLER FOR CARBON-BASED FEEDSTOCK PROCESSING SYSTEM, No. US 10,174,257 B2, filed Jan. 22, 2015, issued Jan. 8, 2019

- Hill, *et al.*, DISTILLATION UNIT FOR CARBON-BASED FEEDSTOCK PROCESSING SYSTEM, No. US 10,174,256 B2, filed Jan. 22, 2015, issued Jan. 8, 2019

- Hill, *et al.*, IN-FEED HOPPER AND METER FOR CARBON-BASED FEEDSTOCK PROCESSING SYSTEM, No. US 11,326,835 B2, filed Dec. 5, 2018, issued May 10, 2022

None of these three patents mentions "carbon capture." None of the figures in the patents depict the CCUs.

### c. Untrue Statements that the CCUs Were Economical and Cost-Effective.

174.    The *SEC v. Hill* Defendants and the Advisory Team Defendants represented that the CCUs were economical and cost-effective for natural gas producers. For example, in the OShares 04 Business Plan, they stated that "use of this equipment on site at the well or the transmission pipeline will save the natural gas producer the cost of transporting gas for processing." They also stated that the CCUs were "a more practical and economical way of accomplishing CO2 removal wherever needed." They also stated that the CCUs "cost-effectively separates, captures, and delivers CO2 for direct use without the necessity of underground storage of expensive transportation." These were untrue statements of material fact because the CCUs were never economical or cost-effective.

### d. Untrue Statements About Demand for the Carbon Capture Technology.

175.    The *SEC v. Hill* Defendants and the Advisory Team Defendants represented that the CETA carbon capture technology was in high demand. For example, in the OShares 04

48

Business Plan, under the heading "HOW CARBON CAPTURE UNITS WORK," they stated: "This is a disruptive new technology that is changing the way that natural gas is processed." They followed this with this paragraph titled "High Demand," where they said that "Carbon Capture Units are a patented technology operated by CETA, which is in very high demand from oil and gas producers currently operating in the Permian Basin in Texas, as well as independent well owners, power plants, and the Department of Energy." In a box on the same page, after falsely claiming that FIC had placed 130 CCUs from 2019 through July 2022, The Business Plan stated: "The market for portable equipment within the CO2 capture space is clearly present." These statements were untrue statements of material fact because the CCUs were not in demand and natural gas producers were not using them to enhance production from their wells.

### e. Untrue Statements that Exxon Was a CETA Customer.

176.    The *SEC v. Hill* Defendants and the Advisory Team Defendants represented to investors that Exxon was a CETA customer and had committed to use thousands of CCUs. For example, On August 19, 2020, Hill, Shelly and Shelly associate Dave Zook met representatives of potential lenders. Hill told them that CETA had a contract with Exxon to use CCUs in connection with its pipelines. On a phone call later, Zook told one of the representatives that Hill kept the Exxon contract guarded and shared it with only a few people. Zook said he had seen the contract and it was signed by Exxon's CEO.

177.    On September 6, 2021, Shelly told a potential investor by telephone that "Exxon actually pays us 6 times in a year, with supplemental payments every six months."

178.    Plaintiffs also rely on the following allegation in the *SEC v. Hill* complaint, which Hill and Shelly have admitted: "Exxon has verified that it has no relationship with CETA, contractual or otherwise, and Exxon has not endorsed CETA's technology." ECF 1, ¶ 42. On

Plaintiffs' information and belief, and based on evidentiary support that Plaintiffs reasonably believe they will develop after a reasonable opportunity for further investigation and discovery, Plaintiffs adopt the foregoing allegation of the *SEC v. Hill* complaint that "Exxon has verified that it has no relationship with CETA, contractual or otherwise, and Exxon has not endorsed CETA's technology."

179.    All of the foregoing statements in Paragraphs 176-177 that Exxon was a CETA customer were untrue statements of material fact.

**2. The Untruths and Omissions Were Made with Actual Awareness they Were False.**

180.    The *SEC v. Hill* Defendants and the Advisory Team Defendants made false misrepresentations of both past and existing material facts in transactions involving the interests sold to investors, including the interests in the FIC Partnerships, described in Paragraphs 61-84, 97-115 and 172-179, above.

181.    The *SEC v. Hill* Defendants and the Advisory Team Defendants made the false representations described in Paragraphs 61-84, 97-115 and 172-179, above, with actual awareness of the falsity thereof. In addition, the Advisory Team Defendants had actual awareness of the falsity of the representations made by the *SEC v. Hill* Defendants, failed to disclose to investors the falsity of the representations, and instead benefitted from the false representations.

182.    The *SEC v. Hill* Defendants and the Advisory Team Defendants knowingly and recklessly made the false representations described in Paragraphs 61-84, 97-115 and 172-179, above.

183.    In the alternative, the Advisory Team Defendants did not exercise reasonable care in obtaining or communicating the information in the representations described in Paragraphs61-84, 97-115 and 172-179, above.

184.    The *SEC v. Hill* Defendants and the Advisory Team Defendants also made statements about what they would do in the future in the financing and operation of, and the distributions and tax benefits from, the CETA carbon capture business and the FIC Partnerships, described in Paragraphs 61-84, 97-115 and 172-179, above.

185.    These statements by the *SEC v. Hill* Defendants and the Advisory Team Defendants about future performance were material.

186.    The *SEC v. Hill* Defendants and the Advisory Team Defendants made their statements about future performance:

a) with the intent not to perform as promised;

b) without a genuine belief that the statements were accurate;

c) without a reasonable basis to believe that the statements were accurate, and

d) with awareness of undisclosed facts that would seriously undermine the accuracy of the statements.

**3. The Misrepresentations Were Made to Induce Investors to Purchase the Interests.**

187.    The *SEC v. Hill* Defendants and the Advisory Team Defendants made the misrepresentations described in Paragraphs 61-84, 97-115 and 172-179, above, intending that they would be communicated to Plaintiffs and all similarly situated investors.

188.    The *SEC v. Hill* Defendants and the Advisory Team Defendants made the misrepresentations described in Paragraphs 61-84, 97-115 and 172-179, above, for the guidance of investors and for the purpose of inducing investors to enter contracts to purchase those interests.

**4. Plaintiffs Relied on the Misrepresentations.**

189.    Plaintiffs and all similarly situated investors justifiably and reasonably relied on the foregoing material misrepresentations described in Paragraphs 61-84, 97-115 and 172-179, above,

51

to their detriment, and the *SEC v. Hill* Defendants and the Advisory Team Defendants benefitted from such reliance.

**5. The Advisory Team Defendants Substantially Assisted the Misrepresentations of the *SEC v. Hill* Defendants.**

190.    In addition to directly making the misrepresentations shown in Paragraphs 61-84, 97-115 and 172-179, above, the Advisory Team Defendants also were aware that the *SEC v. Hill* Defendants made the same misrepresentations.

191.    The Advisory Team Defendants substantially assisted the *SEC v. Hill* Defendants in offering and selling the securities. Plaintiffs reallege and incorporate herein by reference the allegations of Paragraphs 85-116, above.

192.    The Advisory Team Defendants acted with intent to deceive investors or reckless disregard for the truth or the law, by rendering the foregoing assistance to the *SEC v. Hill* Defendants in the face of a perceived risk that the assistance would facilitate untruthful or illegal activity.

**G. The Advisory Team Defendants' Participation in FIC's Breach of Fiduciary Duty.**

193.    As shown above in Paragraphs 25, 26 and 86, FIC was the general partner of each of the FIC Partnerships. In its complaint in *SEC v. Hill*, The SEC states that the FIC Partnership agreements "vest 'exclusive control and management' of the Funds in FIC, and in reality, FIC has controlled all aspects of the Funds with no involvement from the investors, regardless of the type of interest they hold." ECF 1, ¶ 19.

194.    Under Texas law, managing partners owe trust obligations to the partnership. The general partner acting in complete control has the same fiduciary duties to the other partners as a trustee owes to the beneficiaries of the trust. A managing partner owes his co-partners the highest fiduciary duty recognized in the law.

195.    Under Texas law, this "highest fiduciary duty" includes:

    a)  the duty of good faith, fair dealing, loyalty and fidelity over the partnership's affairs and its principal;

    b)  the duty to fully disclose all material facts known to the managing partner that might affect the other partners' rights;

    c)  the duty to account to the partners for all partnership transactions;

    d)  the duty to properly manage, supervise, preserve and safeguard partnership assets, and

    e)  the duty to refrain from self-dealing.

196.    FIC has breached these fiduciary duties to all of the investors, its partners in the FIC Partnerships, resulting in injury to the investors and benefits to FIC.

197.    The Advisory Team Defendants knowingly assisted FIC's breach of fiduciary duty.

## V. VICARIOUS LIABILITY ALLEGATIONS

198.    All of the foregoing conduct by Rauld occurred while Rauld was acting within the course and scope of his employment by Premier. His conduct was within Premier's general authority, was in furtherance of Premier's business, and for the accomplishment of the object for which Rauld was hired.

199.    Premier employed Rauld in a managerial capacity, and all of the foregoing conduct by Rauld occurred while Rauld was acting in the scope of that managerial capacity.

200.    As Rauld's employer, Premier is vicariously liable for all torts committed by Rauld.

201.    As Rauld's employer, all fraud, malice and gross negligence by Rauld is attributable to Premier.

202.    All of the foregoing conduct by Gertz occurred while Gertz was acting within the course and scope of his employment by ProVision. His conduct was within ProVision's general

authority, was in furtherance of ProVision's business, and for the accomplishment of the object for which Gertz was hired.

203.    ProVision employed Gertz in a managerial capacity, and all of the foregoing conduct by Gertz occurred while Gertz was acting in the scope of that managerial capacity.

204.    As Gertz's employer, ProVision is vicariously liable for all torts committed by Gertz.

205.    As Gertz's employer, all fraud, malice and gross negligence by Gertz is attributable to ProVision.

## VI. CLASS ACTION ALLEGATIONS

206.    Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of themselves and a class consisting of all other persons and entities who purchased or otherwise acquired any of the interests sold by the *SEC v. Hill* Defendants, including the interests in the FIC Partnerships, and who were damaged thereby (the "Class").

207.    Excluded from the Class are:

   a.  the Defendants,

   b.  the *SEC v. Hill* Defendants;

   c.  directors and officers of CETA;

   d.  promoters of the interests sold by the *SEC v. Hill* Defendants, including the interests in the FIC Partnerships, including those persons referred to as "Syndicators" or the "Inner Circle";

   e.  all entities identified as "Related Parties" on Exhibit 1 to this Complaint;

   f.  for all entities in sub-parts a-e, above, their officers, directors, managers, managing members, members, subsidiaries, affiliates, employees, agents, successors or assigns;

   g.  for all natural persons in sub-parts a-f, above, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors

or assigns, and any entity in which they or their immediate families have or had a controlling interest, including their family limited partnerships, family limited liability companies, and

h.  any persons or entities who recovered their entire investment and/or made a profit from their purchase or other acquisition of any of the interests sold by the *SEC v. Hill* Defendants, including the interests in the FIC Partnerships.

208.  The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are over 600 members in the proposed Class.

209.  Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of Texas law that is complained of herein.

210.  Plaintiffs will fairly and adequately protect the interests of the other members of the Class, and have retained counsel competent and experienced in class actions, complex litigation and the types of claims asserted herein.

211.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.  whether the Texas Securities Act was violated by Defendants' acts and omissions as alleged herein;

b.  whether the Defendants committed statutory fraud as alleged herein;

c.  whether the Defendants committed common law fraud under Texas law as alleged herein;

d.  whether the Defendants participated in FIC's breaches of fiduciary duty as alleged herein;

e.  whether documents, business plans and other statements disseminated to the members of the Class misrepresented material facts about the business, finances, and distributions of the *SEC v. Hill* Defendants and the FIC Partnerships;

f.  whether documents, business plans and other statements disseminated to the members of the Class misrepresented and/or omitted to disclose material facts about the business, finances, and distributions of the *SEC v. Hill* Defendants and the FIC Partnerships, and

g.  the extent to which the members of the Class have sustained damages and the proper measure of damages.

212.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by some individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

213.    There will be no difficulty in the management of this action as a class action.

## VII. CAUSES OF ACTION

### COUNT I

**VIOLATIONS OF THE TEXAS SECURITIES ACT**
**Title 12 of the Texas Government Code**
**(Against All Defendants)**

214.    Plaintiffs repeat, reallege and incorporate by reference each of the foregoing Paragraphs 1- 213 of this Complaint.

**A. Violations of § 4008.051 and § 4008.052 the Texas Government Code by the Advisory Team Defendants.**

215.    The Advisory Team Defendants offered and sold securities to Plaintiffs and other members of the Class, within the meaning of the terms "offer for sale," "sale" and "security" as defined in Tex. Gov't Code § 4001.067 and 4001.068.

216.    The Advisory Team Defendants are liable to Plaintiffs and other members of the Class under Tex. Gov't Code § 4008.051(a) because the securities that the Advisory Team Defendants offered and sold to Plaintiffs and other members of the Class were not registered pursuant to Chapter 4003 of the Texas Government Code.

217.    The Advisory Team Defendants are liable to Plaintiffs and other members of the Class under Tex. Gov't Code § 4008.052(a) because the Advisory Team Defendants offered and sold securities to Plaintiffs and other members of the Class by means of untrue statements of material fact and/or omissions to state material facts necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading.

**B. Violations of § 4008.055(c) of the Texas Government Code by the Advisory Team Defendants and the Bank Defendants.**

218.    The *SEC v. Hill* Defendants, the FIC Partnerships, and each of the Advisory Team Defendants committed primary violations of Tex. Gov't Code § 4008.051 and § 4008.052.

219.    Each of the Advisory Team Defendants aided and abetted the foregoing primary violations by the *SEC v. Hill* Defendants and the FIC Partnerships, because each of the Advisory Team Defendants directly or indirectly materially aided the *SEC v. Hill* Defendants and the FIC Partnerships as sellers and issuers of securities, with intent to deceive or defraud or with reckless disregard for the truth or the law.

220.    Each of the Advisory Team Defendants aided and abetted the foregoing primary violations by the other Advisory Team Defendants, because each of the Advisory Team Defendants directly or indirectly materially aided the other Advisory Team Defendants, as sellers of securities, with intent to deceive or defraud or with reckless disregard for the truth or the law.

221.    Each of the Bank Defendants aided and abetted the foregoing primary violations of Tex. Gov't Code § 4008.052 by the *SEC v. Hill* Defendants and the FIC Partnerships, because each

57

of the Bank Defendants directly or indirectly materially aided the *SEC v. Hill* Defendants and the FIC Partnerships as sellers and issuers of securities, with intent to deceive or defraud or with reckless disregard for the truth or the law.

222.    As aiders and abettors, each of the Advisory Team Defendants and the Bank Defendants is jointly and severally with the sellers and issuers of the securities, and to the same extent as the sellers and issuers.

**C. Remedies for Violations of the Texas Securities Act.**

223.    Plaintiffs and other members of the Class are entitled to rescission as provided in Tex. Gov't Code § 4008.056.

224.    In the alternative, if any members of the Class no longer own the securities, such members of the Class are entitled to damages as provided in Tex. Gov't Code § 4008.057.

225.    Plaintiffs and other members of the Class are entitled to costs and attorney's fees as provided in Tex. Gov't Code § 4008.060.

<u>**COUNT II**</u>

**STATUTORY FRAUD**
**Texas Business and Commerce Code, § 27.01**
**(Against the Advisory Team Defendants)**

226.    Plaintiffs repeat, reallege and incorporate by reference each of the foregoing Paragraphs 1- 213 of this Complaint.

**A. Direct Statutory Fraud by the Advisory Team Defendants.**

227.    The Advisory Team Defendants made false misrepresentations of both past and existing material facts to Plaintiffs and other members of the Class in transactions involving interests in the FIC Partnerships.

228.    The Advisory Team Defendants also omitted to state material facts which made their misrepresentations misleading under the circumstances in which they were made.

229.    The Advisory Team Defendants made false promises to Plaintiffs and other members of the Class that were material with the intention of not fulfilling them.

230.    The Advisory Team Defendants had actual awareness of the falsity of their misrepresentations, omissions and promises.

231.    The Advisory Team Defendants made the false misrepresentations, omissions and false promises for the purpose of inducing Plaintiffs and other members of the Class to enter contracts to purchase interests in the FIC Partnerships.

232.    Plaintiffs and other members of the Class relied on the Advisory Team Defendants' false misrepresentations, omissions and false promises in entering contracts to purchase interests in the FIC Partnerships.

**B. Liability of the Advisory Team Defendants for Statutory Fraud by the *SEC v. Hill* Defendants and the FIC Partnerships.**

233.    The *SEC v. Hill* Defendants and the FIC Partnerships made false representations and false promises to Plaintiffs and other members of the Class in transactions involving interests in the FIC Partnerships.

234.    The Advisory Team Defendants had actual awareness of the falsity of the representation and promises of the *SEC v. Hill* Defendants and the FIC Partnerships.

235.    The Advisory Team Defendants failed to disclose Plaintiffs and other members of the Class to the falsity of the representation and promises of the *SEC v. Hill* Defendants and the FIC Partnerships.

236.    The Advisory Team Defendants benefitted from the false representations and false promises of the *SEC v. Hill* Defendants and the FIC Partnerships.

**C. Remedies for Statutory Fraud.**

237.    Plaintiffs and other members of the Class are entitled to actual damages as provided by Tex. Bus. & Com. Code § 27.01(b).

238.    Plaintiffs and other members of the Class are entitled to exemplary damages as provided by Tex. Bus. & Com. Code § 27.01(c) and (d).

239.    Plaintiffs and other members of the Class are entitled to attorney's fees, expert witness fees, costs for copies of depositions, and costs of court as provided by Tex. Bus. & Com. Code § 27.01(e).

**COUNT III**

**COMMON LAW FRAUD**
**(Against the Advisory Team Defendants)**

240.    Plaintiffs repeat, reallege and incorporate by reference each of the foregoing Paragraphs 1- 213 of this Complaint.

241.    The Advisory Team Defendants knowingly and recklessly made false and material misrepresentations intended to be communicated to Plaintiffs and other members of the Class.

242.    The Advisory Team Defendants also omitted to state material facts which made their representations misleading.

243.    The Advisory Team Defendants knew that their representations were false when they made them.

244.    Plaintiffs and other members of the Class relied on the foregoing misrepresentations to their detriment, and the Advisory Team Defendants have benefitted from such reliance.

245.    Plaintiffs and other members of the Class are entitled to actual damages that resulted from the Advisory Team Defendants' fraud.

60

246.    Plaintiffs and other members of the Class are entitled to exemplary damages for the Advisory Team Defendants' fraud.

## COUNT IV

### NEGLIGENT MISREPRESENTATION
### (Against the Advisory Team Defendants)

247.    Plaintiffs repeat, reallege and incorporate by reference each of the foregoing Paragraphs 1- 213 of this Complaint.

248.    The Advisory Team Defendants made representations to Plaintiffs and other members of the Class in the course of their business and in the course of transactions in which they had a pecuniary interest.

249.    The representations by the Advisory Team Defendants supplied false information for the guidance of Plaintiffs and other members of the Class in their business.

250.    The Advisory Team Defendants did not exercise reasonable care in obtaining or communicating the information in the representations to Plaintiffs and other members of the Class.

251.    Plaintiffs and other members of the Class justifiably relied on the representations by the Advisory Team Defendants.

252.    Plaintiffs and other members of the Class are entitled to actual damages proximately caused by the negligent misrepresentations of the Advisory Team Defendants.

253.    Plaintiffs and other members of the Class are entitled to exemplary damages for the Advisory Team Defendants' negligent misrepresentations.

## COUNT V

**KNOWING PARTICIPATION IN BREACH OF FIDUCIARY DUTY**
**(Against the Advisory Team Defendants)**

254.    Plaintiffs repeat, reallege and incorporate by reference each of the foregoing Paragraphs 1- 213 of this Complaint.

255.    FIC and Shelly owed fiduciary duties to Plaintiffs and other members of the Class.

256.    FIC and Shelly breached their fiduciary duties to Plaintiffs and other members of the Class.

257.    The Advisory Team Defendants knew of the fiduciary relationship between FIC and Shelly, as fiduciaries, and Plaintiffs and other members of the Class, as beneficiaries.

258.    The Advisory Team Defendants participated in the breaches of fiduciary duties by FIC and Shelly, and the Advisory Team Defendants were aware of their participation.

259.    Plaintiffs and other members of the Class are entitled to actual damages proximately caused by the breaches of fiduciary duties by FIC and Shelly.

260.    Plaintiffs and other members of the Class are entitled to recover all fees, profits and benefits received by the Advisory Team Defendants from their participation in the breaches of fiduciary duties by FIC and Shelly.

261.    Plaintiffs and other members of the Class are entitled to exemplary damages for the Advisory Team Defendants' participation in the breaches of fiduciary duties by FIC and Shelly.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Alex Goldovsky, Glynn Frechette, John Krupey, and Kristin Scharf, individually and on behalf of the Class, request the following relief, and pray that the Court declare this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein, and that the enter judgment as follows:

A.      Awarding Plaintiffs and the other members of the Class rescission as provided in Tex. Gov't Code § 4008.056 and at Texas common law;

B.      Awarding Plaintiffs and the other members of the Class actual damages, including damages as provided in Tex. Gov't Code § 4008.057;

C.      Awarding Plaintiffs and the other members of the Class the fees, profits and benefits received by the Advisory Team Defendants;

D.      Awarding Plaintiffs and the other members of the Class exemplary damages as provided in Chapter 41 of the Texas Civil Practice & Remedies Code;

E.      Awarding Plaintiffs and the other members of the Class prejudgment interest under Texas law, at the rate of 8.5% per annum in effect as of the date of this Complaint, or at such rate as the Texas Consumer Credit Commissioner shall determine at the relevant date(s) in the future;

F.      Awarding Plaintiffs and the other members of the Class costs, attorney's fees, and expert witness fees, including those provided in Tex. Gov't Code § 4008.060, Tex. Bu. & Com. Code § 27.01(e), and the Federal Rules of Civil Procedure, as applicable;

G.      Awarding Plaintiffs and the other members of the Class interest on the final judgment as provided by 28 U.S.C. § 1961; and

H.      Awarding Plaintiffs and the other members of the Class such other relief as this Court deems appropriate.

## IX. DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.


Dated: March 27, 2024                    Respectfully submitted,


                                         */s/Patrick Zummo*
                                         Patrick Zummo
                                         Texas Bar No. 22293450
                                         Lisa Gerling Zummo
                                         Texas Bar No. 07818500
                                         LAW OFFICES OF PATRICK ZUMMO
                                         950 Echo Lane, Suite 333
                                         Houston, Texas 77024
                                         (713) 651-0590 (Telephone)
                                         pzummo@zoomlaw.com
                                         lzummo@zoomlaw.com

                                         *Attorneys for Plaintiffs*
                                         *and the Proposed Class*